899 F.2d 951
 58 USLW 2617, 1990-1 Trade Cases 68,970
 Walter L. REAZIN, M.D.; HCA Health Services of Kansas,
Inc., d/b/a Wesley Medical Center; Health Care
Plus, Inc.; and New Century Life
Insurance Co., Plaintiffs-Appellees,
v.
BLUE CROSS AND BLUE SHIELD OF KANSAS, INC., Defendant and
Counterclaim Plaintiff-Appellant,
and
HMO Kansas, Inc., Additional Counterclaim Plaintiff-Appellant,
v.
HOSPITAL CORPORATION OF AMERICA, Additional Counterclaim
Defendant-Appellee.
 No. 87-1823.
 United States Court of Appeals,
Tenth Circuit.
 March 29, 1990.
Motion for Leave to File Petition for Rehearing Out of Time
Denied May 22, 1990.
 
 Daniel R. Shulman, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, Minn. (Gary D. McCallister, Davis, Wright, Unrein, Hummer & McCallister, Topeka, Kan., and Joseph M. Alioto, Alioto & Alioto, San Francisco, Cal., with him on the briefs), for appellants.
 Robert H. Rawson, Jr., Jones, Day, Reavis & Pogue, Cleveland, Ohio (Robert M. Duncan, Joe Sims, and Joseph F. Winterscheid, Jones, Day, Reavis & Pogue, Cleveland, Ohio, and Donald R. Newkirk, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., with him on the briefs), for plaintiffs-appellees.
 Before MOORE, ANDERSON, and BRORBY, Circuit Judges.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 Blue Cross and Blue Shield of Kansas, Inc. ("Blue Cross") appeals an adverse verdict entered in an antitrust and state law tortious interference case. Both the antitrust and state law claims arose out of the same set of facts.
 
 
 2
 The parties have attempted to make this case very complex, but the antitrust issues are relatively straightforward. Plaintiffs' theory was that Blue Cross, alarmed by a perceived competitive threat from Hospital Corporation of America ("HCA") through its acquisitions of a major Wichita hospital now called HCA Health Services of Kansas, Inc. d/b/a Wesley Medical Center ("Wesley"), Health Care Plus, Inc. ("HCP"), and New Century Life Insurance Co. ("New Century"), determined to "hurt" Wesley and thereby send a message to other hospitals not to do business with entities Blue Cross believed were competitors. It did this by agreeing with Wesley's competitors, St. Joseph Hospital and St. Francis Hospital ("the Saints"), to terminate Wesley's contracting provider agreement and to reduce the maximum allowable payments it would make to the Saints, thereby increasing Wesley's costs of doing business and causing a shift of Blue Cross patients from Wesley to the Saints. The threatened termination of Wesley because of its affiliation with a Blue Cross competitor made other hospitals less willing to affiliate with, or enter into relationships with, Blue Cross competitors. The result was that Kansas health care consumers were restricted in their access to and benefits from health care financing arrangements involving entities other than Blue Cross, and were deprived of the benefits of competition in that arena. The jury agreed with plaintiffs and found multiple antitrust violations by Blue Cross.
 
 
 3
 Given our standard of review, we uphold the jury's verdict because we find sufficient evidence supports it. In so holding, we reach the following specific conclusions: (1) Wesley has standing to assert its antitrust claims and proved an antitrust injury; (2) Blue Cross entered into an agreement with the Saints which restrained trade in the market of health care financing; (3) Blue Cross had market and monopoly power and it willfully maintained its monopoly power; (4) Wesley adequately proved its damages; (5) the court properly instructed the jury on the various antitrust claims involved; (6) the court properly instructed the jury on plaintiffs' state law claims and sufficient evidence supports the jury's verdict on those claims; (7) Blue Cross suffered no prejudice from the court's supplemental "Allen " charges or any communications with the jury during deliberations; (8) the court properly granted plaintiffs' motion for summary judgment on the counterclaim; and (9) the award of attorneys' fees and costs is affirmed in all respects except we remand for a recalculation of the expert witness fees awarded.
 
 PROCEDURAL HISTORY
 
 4
 Plaintiffs Walter L. Reazin, M.D., Wesley, HCP, and New Century brought this antitrust action against Blue Cross. Plaintiffs alleged violations of sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. Secs. 1 and 2, as well as violations of state law, arising out of Blue Cross' threatened termination of its contracting provider agreement with Wesley. They sought damages and other relief.[1] Blue Cross and its wholly-owned subsidiary, HMO Kansas, Inc. ("HMOK"), counterclaimed against plaintiffs as well as HCA, alleging: that HCA's acquisitions of Wesley, HCP, and New Century violated the antitrust laws; that HMOK's failure in Wichita was the result of an unlawful boycott and concerted refusal to deal or an unreasonable restraint of trade; that plaintiffs had monopolized, attempted to monopolize, and/or conspired to monopolize the market for health care financing and health care services; and, asserting tortious interference with prospective advantage, in violation of Kansas law. They sought damages and other relief.
 
 
 5
 Pursuant to plaintiffs' motion, the district court separated the trials of the complaint and the counterclaim. After a six-week jury trial on plaintiffs' complaint, and four weeks of deliberation, the jury returned a verdict in favor of Wesley, finding that Blue Cross had violated section 1 of the Sherman Act by engaging in a conspiratorial restraint of trade, had violated section 2 by monopolizing the relevant market, and had tortiously interfered with Wesley's present and prospective business relations in violation of Kansas law. It awarded Wesley $1,542,980 in actual damages for the antitrust violations and $1.00 in actual nominal damages and $750,000 in punitive damages for the tortious interference claim.[2]
 
 
 6
 Numerous post-trial motions followed. Ultimately, in a 124-page written opinion, the district court denied Blue Cross' motions to set aside the verdict and dismiss the case for lack of jurisdiction, for a directed verdict, and for judgment n.o.v. or for a new trial. Reazin v. Blue Cross & Blue Shield, Inc., 663 F.Supp. 1360 (D.Kan.1987) ("Reazin II ").[3] It also denied plaintiffs' motion for injunctive relief against Blue Cross under Section 16 of the Clayton Act, 15 U.S.C. Sec. 26. After trebling the actual damages awarded Wesley, the court entered judgment in the amount of $5,378,941.00, plus interest. It awarded plaintiffs their requested sum of $2,176,983.75 in attorney's fees, and a total of $246,844.99 in other fees and costs. Finally, it granted plaintiffs' motion for summary judgment on the counterclaim. Blue Cross appeals essentially all of the district court's rulings, and is joined by HMOK with respect to the grant of summary judgment on the counterclaim.
 
 FACTS
 
 7
 The complex facts and history of this case have been thoroughly recounted in the two district court opinions. See Reazin I, 635 F.Supp. 1287, and Reazin II, 663 F.Supp. 1360. We recite here only the basic undisputed facts relevant to this appeal.
 
 
 8
 Blue Cross, a non-profit company formed in 1983 by combining Blue Cross of Kansas, Inc. and Blue Shield of Kansas, Inc., is the largest private health care financing organization in Kansas.[4] It is chartered under a special enabling act. It is approximately fifteen times bigger than the next largest private health care financing organization, in terms of percent of earned health insurance premiums. Pl.'s Ex. 508K, Addendum to Answer Brief of Appellees Vol. I.
 
 
 9
 "In 1985, all hospitals and approximately 90% of all physicians in [the Blue Cross] service area [which includes the entire state except for Johnson and Wyandotte Counties] were under contract with [Blue Cross] as providers of medical services to the company's subscribers. No other health insurance company has contracts with all of the hospitals in [Blue Cross'] service area. [Blue Cross] is also the federal Medicare intermediary in Kansas, administering the Medicare program throughout the company's service area; as well, it is one of the larger third-party administrators of self-insured programs in the state."
 
 
 10
 Reazin II, 663 F.Supp. at 1372 (citations to record omitted). Blue Cross is required under its enabling legislation to pursue cost containment as its primary goal.
 
 
 11
 Wesley is the largest, and "by far the strongest," hospital in Wichita. Reazin I, 635 F.Supp. at 1297. It is a major teaching hospital, as well as a provider of clinical services, medical research, and outreach care programs. There was testimony that Wesley is considered one of the premier hospitals in Kansas and has historically been a low-cost provider of quality health care. Wesley's competitors in Wichita are the Saints and Riverside Hospital.
 
 
 12
 HCP is a health maintenance organization ("HMO") founded in 1981, which provides private health care financing to businesses and individuals in Kansas, including Sedgwick County and Wichita.[5]
 
 
 13
 HCA, based in Nashville, Tennessee, "through its subsidiary corporations, is engaged in the business of providing health care services, private health care financing and hospital management services." Reazin II, 663 F.Supp. at 1373. In terms of the number of hospitals owned or managed, HCA is the largest for-profit hospital company in the United States. However, Dr. Thomas Frist, the chairman and chief executive officer of HCA, testified that HCA "represent[s] less than three percent ... of the hospital sector in this country [and] ... close to fifty percent of [HCA's] revenues come through third-party insurers, of which Blue Cross is a large percentage." R. Vol. 32 at 3187-88.
 
 
 14
 New Century is a California corporation with its principal executive offices in Nashville. Its activities include the provision of private health care financing. In June 1983, it received its certificate of authority to do business in Kansas.[6]
 
 
 15
 The parties stipulated to the following additional and relevant facts:
 
 
 16
 "On April 25, 1985, HCA consummated the acquisition of New Century Life Insurance Company.
 
 
 17
 On July 11, 1985, HCA acquired Wesley Medical Center. The acquisition was effected through HCA Health Services of Kansas, Inc., a wholly-owned subsidiary of HCA.
 
 
 18
 On August 14, 1985, HCA acquired Health Care Plus. The acquisition was effected through Health Care Plus of America, Inc., a wholly-owned subsidiary of HCA. Since its acquisition, Health Care Plus has continued to develop, market and sell health care financing products in competition with Blue Cross.
 
 
 19
 On August 29, 1985, at a special meeting, the Executive Committee of the Blue Cross Board of Directors voted to terminate the existing contracting provider agreement between Blue Cross and Wesley, effective December 31, 1985.[7]
 
 
 20
 On or about August 29, 1985, Blue Cross formally advised Wesley by letter of the decision of its Executive Committee to terminate Wesley's contracting provider agreement. On that same date, Blue Cross released details of the termination to the local media in Wichita. In an August 29 news release, Blue Cross indicated that subsequent to the effective date of Wesley's termination as a participating hospital, Blue Cross payments would be sent directly to the subscriber and could not be assigned to Wesley.
 
 
 21
 On September 5, 1985, G. Wayne Johnston, President of Blue Cross, met privately with A.B. Davis, Jr., Chairman and Chief Executive Officer of Wesley, and Mr. Robert J. O'Brien, Wesley's executive Vice President--Corporate Development, to discuss Wesley's termination. Also in attendance at the September 5 meeting was Marlon R. Dauner, Senior Vice President of Blue Cross.
 
 
 22
 On September 9, 1985, Mr. Johnston spoke with Mr. Davis.
 
 
 23
 On September 10, 1985, David G. Williamson, Vice Chairman of HCA, telephoned Mr. Johnston to discuss Blue Cross' decision to terminate Wesley.
 
 
 24
 On September 10, 1985, Blue Cross ran a full-page ad in the Wichita Eagle Beacon announcing that Wesley would be a noncontracting hospital effective January 1, 1986.
 
 
 25
 On or about September 10, 1985, Blue Cross issued a publication entitled "Health Plan" to certain subscribers in Kansas.
 
 
 26
 At a meeting of the Blue Cross Executive Committee held on September 19, 1985, Wesley sought reconsideration of Blue Cross' termination decision. Blue Cross has refused to reverse its decision to terminate Wesley's contracting provider agreement. At the September 19, 1985 meeting, Blue Cross' Executive Committee approved a reduction in the Peer Group V MAPs for all covered services. The reduction affects only Wichita hospitals in Peer Group V. The MAPs for other peer groups in Kansas remain unchanged.
 
 
 27
 By letter dated September 25, 1985, Donald A. Wilson, President of the Kansas Hospital Association, asked Blue Cross to comment on its termination of Wesley. Blue Cross issued a reply dated October 3, 1985, to all Kansas hospitals.[8]
 
 
 28
 By letter dated October 15, 1985, Administrative Services of Kansas, Inc., a subsidiary of Blue Cross, advised Wesley that effective January 1, 1986, said subsidiary would terminate its lease agreement with Wesley for electronic data processing equipment transmitting inquiries via telecommunication lines to said subsidiary. The lease agreement enabled Wesley to obtain prompt benefits verification. The lease agreement was being terminated because of the termination of Wesley's contracting provider agreement with Blue Cross.[9]
 
 
 29
 Blue Cross does not honor or recognize the assignment of benefits by subscribers to noncontracting hospitals under the terms of the subscriber agreements.
 
 
 30
 Part V.f. of the standard Blue Cross subscriber agreement provides that insurance proceeds will be paid directly by Blue Cross to participating hospitals, but that proceeds for medical services performed by nonparticipating hospitals will be paid directly to the subscriber and cannot be assigned to any other person or entity."
 
 
 31
 R. Vol. III, Tab 207 at Instruction 15 (paragraph letters omitted).
 
 ANTITRUST ISSUES
 
 32
 Blue Cross filed a motion under Fed.R.Civ.P. 12(b) to set aside the verdict and dismiss the case for lack of jurisdiction, asserting that its challenged conduct is exempt from the application of the antitrust laws under the McCarran-Ferguson Act, 15 U.S.C. Secs. 1011-1015. The district court disagreed, holding that no McCarran-Ferguson exemption applied and that it had jurisdiction. We affirm for the reasons set forth in the district court's discussion of this issue. Reazin II, 663 F.Supp. at 1401-09.
 
 
 33
 The district court denied Blue Cross' motions for a directed verdict, for a judgment n.o.v., or alternatively for a new trial. Reazin II, 663 F.Supp. 1360. " 'Motions for a directed verdict and for judgment n.o.v. are considered under the same standard.' " Zimmerman v. First Fed. Sav. & Loan Ass'n, 848 F.2d 1047, 1051 (10th Cir.1988) (quoting Hurd v. American Hoist & Derrick Co., 734 F.2d 495, 498 (10th Cir.1984)). We may reverse the denial of such motions "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the [plaintiffs]; we must construe the evidence and inferences most favorably to the nonmoving party [plaintiffs]." Zimmerman, 848 F.2d at 1051. We "may not weigh the evidence or pass upon the witnesses' credibility, or substitute [our] judgment for that of the jury." Hurd v. American Hoist & Derrick Co., 734 F.2d 495, 498 (10th Cir.1984). Thus, if reasonable minds could differ over the verdict, the motion for judgment n.o.v. was properly denied. We review the denial of Blue Cross' motion for a new trial under an abuse of discretion standard. Patty Precision Prods., Co. v. Brown & Sharpe Mfg. Co., 846 F.2d 1247, 1251 (10th Cir.1988); Brown v. McGraw-Edison Co., 736 F.2d 609, 616 (10th Cir.1984).
 
 A. Section 1
 
 34
 Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce...." 15 U.S.C. Sec. 1. This has been interpreted to prohibit only "unreasonable" restraints. Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988); Arizona v. Maricopa County Medical Soc'y, 457 U.S. 332, 342-43, 102 S.Ct. 2466, 2472-73, 73 L.Ed.2d 48 (1982); Drury Inn-Colorado Springs v. Olive Co., 878 F.2d 340, 342 (10th Cir.1989). To affirm the district court's denial of Blue Cross' motions for judgment n.o.v. or for a new trial on the section 1 claim, there must be sufficient evidence supporting the jury's finding of an agreement which unreasonably restrained trade in the relevant market--private health care financing.[10]
 
 
 35
 The district court submitted plaintiffs' section 1 claim to the jury under the Rule of Reason. "As stated by the Supreme Court, 'the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition.' " Smith Mach. Co. v. Hesston Corp., 878 F.2d 1290, 1298 (10th Cir.1989) (quoting National Soc'y of Professional Eng'rs v. United States, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978)), cert. denied, --- U.S. ----, 110 S.Ct. 1119, 107 L.Ed.2d 1026 (1990). The factfinder must "decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." Maricopa County Medical Soc'y, 457 U.S. at 343, 102 S.Ct. at 2472. In making that decision "a variety of actual market factors" must be examined. Smith Mach. Co., 878 F.2d at 1298 (citing Chicago Bd. of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918)). The plaintiff bears the burden of proving the " 'adverse effect on competition.' " Smith Mach. Co., 878 F.2d at 1298 (quoting Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 29, 31, 104 S.Ct. 1551, 1567, 1568, 80 L.Ed.2d 2 (1984)). As the above statements indicate, the adverse impact must be on competition, not on any individual competitor or on plaintiff's business. See Westman Comm'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1220 (10th Cir.1986), cert. denied, 486 U.S. 1005, 108 S.Ct. 1728, 100 L.Ed.2d 192 (1988); Christofferson Dairy v. MMM Sales, 849 F.2d 1168, 1172 (9th Cir.1988). Additionally, "we must bear in mind that the purpose of the antitrust laws is the promotion of consumer welfare.... [W]e consider [defendant's] refusal to deal in light of its effect on consumers, not on competitors." Westman Comm'n Co., 796 F.2d at 1220 (citations omitted).
 
 
 36
 The jury found that Blue Cross had engaged in a contract, combination, or conspiracy with St. Francis and/or St. Joseph Hospitals, encompassing within its terms the termination of Wesley as a contracting provider, and the reduction of the maximum allowable payments for the remaining Peer Group V hospitals.[11] See Reazin II, 663 F.Supp. at 1398. Blue Cross argues on appeal that the district court erred in denying its motions for judgment n.o.v. or for a new trial on the section 1 claim, asserting that (1) it engaged in independent, as opposed to concerted, activity when it terminated Wesley; (2) it did not unreasonably restrain trade in the health care financing market, and (3) it lacked market power.[12] It also argues that Wesley failed to establish antitrust injury, standing, or recoverable damages. We take up standing and antitrust injury first.
 
 
 37
 (i) Standing and Injury
 
 
 38
 Blue Cross argues that Wesley failed to establish antitrust injury and standing. Standing and antitrust injury are essential elements in a private antitrust damages action brought under section 4 of the Clayton Act. See Cargill, Inc. v. Monfort, Inc., 479 U.S. 104, 110, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986); Associated Gen. Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 738 F.2d 1509, 1523 (10th Cir.1984), aff'd, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); Central Nat'l Bank v. Rainbolt, 720 F.2d 1183, 1187 (10th Cir.1983). They are related, although they are often treated separately by courts. See Alberta Gas Chems., Ltd. v. E.I. Du Pont de Nemours & Co., 826 F.2d 1235, 1240 (3d Cir.1987) ("It has been suggested that although standing is closely related to antitrust injury, the two concepts are distinct. Once antitrust injury has been demonstrated by a causal relationship between the harm and the challenged aspect of the alleged violation, standing analysis is employed to search for the most effective plaintiff from among those who have suffered loss."), cert. denied, 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988). See generally Page, The Scope of Liability for Antitrust Violations, 37 Stan.L.Rev. 1445, 1483-85 (1985). The close connection between them has, however, been underscored recently. See Areeda & Turner, Antitrust Law, p 334.1 (Supp.1989) (Recent Supreme Court cases "closely link standing to a showing of 'antitrust injury.' "); Bell v. Dow Chem. Co., 847 F.2d 1179, 1182 (5th Cir.1988) ("Antitrust injury is a component of the standing inquiry, not a separate qualification.").
 
 
 39
 Plaintiffs argue Blue Cross has waived the right to object to Wesley's standing or the existence of compensable injury because it failed to so object in its motion for a directed verdict.[13] In denying Blue Cross' motion for judgment n.o.v. or for a new trial, the district court concluded that Blue Cross was barred from challenging Wesley's standing under section 1:
 
 
 40
 "Throughout this litigation, defendant has never challenged Wesley's standing under Sec. 1, and it may not do so now. Indeed, defendant's position at the summary judgment stage was that Dr. Reazin, New Century, and HCP lacked standing because Wesley was the only plaintiff with appropriate standing under Sec. 1. Failing to raise this issue, either at summary judgment or on its motion for directed verdict, defendant is now barred from pursuing this contention on a motion for JNOV or new trial."
 
 
 41
 Reazin II, 663 F.Supp. at 1425 (emphasis original in part, added in part) (citation omitted).[14]
 
 
 42
 Courts do not agree on whether antitrust standing can be waived. Compare NCAA v. Bd. of Regents, 468 U.S. 85, 97 n. 14, 104 S.Ct. 2948, 2958 n. 14, 82 L.Ed.2d 70 (1984) (Court did not address antitrust injury issue not raised by the parties); General Inv. Co. v. New York Cent. R.R. Co., 271 U.S. 228, 230-31, 46 S.Ct. 496, 497-98, 70 L.Ed. 920 (1926); R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139, 154 (9th Cir.1989) (en banc) (Norris, J., dissenting); Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 303 (2d Cir.1979) (standing issue not raised below waived on appeal), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), with R.C. Dick Geothermal Corp., 890 F.2d at 145 (majority opinion noted that standing is "not a jurisdictional question but one properly raised at any stage of the litigation"); Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1461 (6th Cir.1988) (court addressed antitrust standing issue not raised below, as a matter of its discretion " 'to be exercised on the facts of individual cases' ") (quoting Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976)), cert. denied, --- U.S. ----, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988).
 
 
 43
 We need not decide whether Blue Cross can now properly challenge Wesley's standing and the existence of antitrust injury because, applying the Supreme Court's guidelines set forth in Cargill, Inc. v. Monfort, Inc., 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1987), Associated General Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), Blue Shield v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), and Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), we conclude Wesley had standing and demonstrated the requisite injury.[15]
 
 
 44
 Wesley introduced evidence at trial that, because of Blue Cross' announced termination of Wesley as a contracting provider hospital, it (1) spent money on advertisements to reassure patients that Blue Cross subscribers were still welcome at Wesley, (2) reduced its prices in order to retain its market share, and (3) lost patients. Blue Cross responds that "[n]one of these claimed injuries flowed from the exclusion of competition from the health care financing market, or from an increase in prices for consumers of health insurance." Brief of Appellants at 34. Blue Cross thus argues that, for example, Wesley's alleged injury resulting from its reduction of its maximum allowable payments in order to retain its market share is an injury resulting from increased competition and from action benefiting consumers and therefore is not antitrust injury.
 
 
 45
 The Supreme Court has suggested that Brunswick should not be read overly narrowly--"while an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which Sec. 4 potentially offers redress, ... that is not the only form of injury remediable under Sec. 4." McCready, 457 U.S. at 482-83, 102 S.Ct. at 2550-51 (citation omitted). The Supreme Court specifically noted that " '[t]he statute does not confine its protection to consumers, or to purchasers, or to competitors ...' " Id. at 472, 102 S.Ct. at 2544 (quoting Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948)).[16] "Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely 'the type of loss that the claimed violations ... would be likely to cause.' " McCready, 457 U.S. at 479, 102 S.Ct. at 2548 (quoting Brunswick Corp., 429 U.S. at 489, 97 S.Ct. at 697); cf. Associated Gen. Contractors, 459 U.S. at 537-45, 103 S.Ct. at 908-12 (union denied standing to argue that multiemployer association and its members coerced certain third parties and some of the multiemployer association's members to enter into business relationships with nonunion firms, thereby restraining the union's business activities.).
 
 
 46
 Blue Cross challenges Wesley's standing on the ground that it "was not in the relevant market selected by the court, health care financing, either as a consumer or as a competitor." Brief of Appellants at 33. While it is true that Wesley was not itself a direct participant in the provision of health care financing, it was, by virtue of its affiliation with HCA and HCP, a perceived competitor of Blue Cross. Indeed, as the district court stated, "that is the precise reason [Blue Cross] undertook the conduct at issue in this case." Reazin II, 663 F.Supp. at 1426 n. 17. In any event, as the Supreme Court has specifically held, an antitrust plaintiff need not necessarily be a competitor or consumer. See McCready, 457 U.S. at 472, 102 S.Ct. at 2544. Where the plaintiff's injury is "inextricably intertwined" or "so integral an aspect of the conspiracy alleged" plaintiff has established an antitrust injury. Id. at 484, 479, 102 S.Ct. at 2551, 2548. Here, Wesley's claimed injuries were an "integral aspect" of the conspiracy to restrain trade in the health care financing market. Indeed, Wesley was the direct victim of Blue Cross' actions. See Associated Gen. Contractors, 459 U.S. at 529-30 n. 19, 103 S.Ct. at 904 n. 19. There was also evidence that Blue Cross specifically intended to harm Wesley.
 
 
 47
 (ii) Agreement
 
 
 48
 Section 1 requires the existence of an agreement between the allegedly conspiring parties. See Fisher v. City of Berkeley, 475 U.S. 260, 266, 106 S.Ct. 1045, 1049, 89 L.Ed.2d 206 (1986); Smith Mach. Co., 878 F.2d at 1294; McKenzie v. Mercy Hosp., 854 F.2d 365 (10th Cir.1988). We are well aware, as Blue Cross urges on us, that a business retains the right under section 1 to unilaterally announce the terms on which it will deal and refuse to deal with those who will not comply. Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); Motive Parts Warehouse v. Facet Enterps., 774 F.2d 380, 386 (10th Cir.1985).
 
 
 49
 The challenged agreement need not be in writing or even be explicit. "[C]onspiratorial conduct may be established by circumstantial evidence." Cayman Explor. Corp. v. United Gas Pipe Line, 873 F.2d 1357, 1361 (10th Cir.1989) (citing Loew's, Inc. v. Cinema Amusements, Inc., 210 F.2d 86, 93 (10th Cir.), cert. denied, 347 U.S. 976, 74 S.Ct. 787, 98 L.Ed. 1115 (1954)); see also Monument Builders, Inc. v. American Cemetery Ass'n., 891 F.2d 1473 (10th Cir.1989). Where evidence of a conspiracy is ambiguous, the Supreme Court has stated, "[t]o survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of Sec. 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Monsanto Co., 465 U.S. at 764, 104 S.Ct. at 1471); see also Monument Builders, 891 F.2d at 1481 n. 8 ("The [Supreme] Court [in Matsushita and Monsanto Co.] did not intend to end reliance on circumstantial proof of conspiracy, but rather to avoid reliance exclusively on evidence which is 'as consistent with permissible competition as with illegal conspiracy.' ") (quoting Matsushita, 475 U.S. at 588, 106 S.Ct. at 1357). Blue Cross argues that the evidence failed to establish the existence of an agreement.
 
 
 50
 We agree with the district court that sufficient circumstantial evidence supports the jury's finding of an agreement. See Reazin II, 663 F.Supp. at 1421-24. The evidence and testimony concerning the precise circumstances under which the Saints accepted the reduced maximum allowable payments and learned of the proposed Wesley termination were conflicting. However, the series of meetings between Blue Cross and the Saints during the spring and summer of 1985 concerning a new HMO program "established an existing forum" within which discussions relating to Wesley's termination and the maximum allowable payments reduction could, and eventually did, take place. Reazin II, 663 F.Supp. at 1422. John Knack, the vice-president of Blue Cross who was intimately involved in the proposed Wesley termination, testified in his deposition (read into the record at trial) that "right from the first meeting [the Saints] indicated they would consider a discount." R. Vol. 28 at 2602. Marlon Dauner, the senior vice-president of Blue Cross, also intimately involved in the entire Wesley termination decision, testified at trial that the three decisions --to cancel Wesley's contracting provider agreement, to abandon the Choice Care program, and to seek reduced MAPs--were "related." R. Vol. 19 at 970.[17]
 
 
 51
 The chief financial officer of St. Francis, Stephen Harris, prepared a memorandum dated September 3 to Sister Sylvia Egan, the chief executive officer of St. Francis, which stated in pertinent part:
 
 
 52
 "When you left for Wisconsin [on August 16], we were working with Blue Cross on various options that would allow Blue Cross to cancel Wesley's Blue Cross contract. At that time, Blue Cross felt they needed a 25% discount from the 1986 MAPs in order to offer a large enough discount [to] the 'employer' so that the program would be supported and the 'Wesley Boycott' would work.
 
 
 53
 After a lot of discussion involving several different scenario [sic], we agreed on a straight 20% discount from the 1986 MAPs."
 
 
 54
 Plaintiffs' Ex. 4, Addendum to Answer Brief of Appellees Vol. I.
 
 
 55
 St. Joseph's vice-president of administration, Edward Sullivan, wrote a memorandum to his superior, William Leeker, after this lawsuit was filed, in which he stated that "[i]mplementation of [the] new 1986 MAPs would be delayed if the HCA suit is successful in gaining a temporary injunction. In that case the original 1986 MAPs would be used." Plaintiffs' Ex. 5, Id. (emphasis original). In fact, the new reduced MAPs were implemented, even though Robert Pearcy, Blue Cross' former director of institutional relations, testified in his deposition, which was read into the record at trial, that there had been an agreement after this lawsuit was filed to utilize the original 1986 maximum allowable payments. Plaintiffs' Ex. 551 at p. 64, Addendum to Answer Brief of Appellees Vol. II. Thus, there was ample evidence that the decision to terminate Wesley and the decision to reduce the maximum allowable payments were interrelated and part of a common design to increase Wesley's costs of doing business and to drain patients from Wesley to the Saints, thereby harming Wesley.[18]
 
 
 56
 Viewing the evidence in the light most favorable to plaintiffs, as we must, we affirm the district court's conclusion that sufficient evidence supports a finding of " 'a conscious commitment to a common scheme,' " Monsanto Co., 465 U.S. at 764, 104 S.Ct. at 1471 (quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 111 (3d Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)), sufficient to satisfy section 1's requirement of an agreement.[19]
 
 
 57
 (iii) Unreasonable Restraint of Trade
 
 
 58
 An additional essential element in a section 1 claim is the existence of an unreasonable restraint of trade. See Dreiling v. Peugeot Motors of America, Inc., 850 F.2d 1373, 1381 (10th Cir.1988); Christofferson Dairy, 849 F.2d at 1172.
 
 
 59
 The jury found an unreasonable restraint of trade in the private health care financing market. The district court concluded that ample evidence supported the jury's findings. It summarized the evidence as follows:
 
 
 60
 "[T]he market restraint alleged in this case is within private health care financing. [Blue Cross'] abandonment of its indemnity insurance in favor of a 'new PPO', under which it will contract only with providers not aligned with competing insurance companies, injects a market distortion.... [Blue Cross] discriminated against a particular class of medical provider, and there was abundant evidence from which the jury could have found defendant's conduct was undertaken with the intent and effect of preventing providers from contracting with other insurance companies. At issue in this case is not a pristine 'agreement to purchase services from certain sellers, and not from another.' Rather, substantial evidence demonstrated, and the jury apparently found, [Blue Cross'] conduct restricted the ability of other buyers (competing health care financing organizations) to purchase hospital services on a competitive basis through alternative delivery systems, thereby restraining competition in the health care financing market...."
 
 
 61
 Reazin II, 663 F.Supp. at 1412-13. The court also emphasized the fact that there was "conduct involving at least in part a horizontal conspiracy between competing providers." Id. at 1414. It was further influenced by evidence that Blue Cross' motive for undertaking the conduct it did was anticompetitive.
 
 
 62
 Blue Cross argues there was no unreasonable restraint of trade in the private health care financing market because (1) Wesley, the only party the jury found to have been injured, was not in the health care financing market, but only in the health care services market; (2) no evidence demonstrated that the announced termination of Wesley's contract prevented hospitals from vertically integrating into health care financing or prevented health care financing businesses from contracting with hospitals; and (3) the effects in the health care financing market were procompetitive and proconsumer, in that insurer premiums for Blue Cross subscribers were reduced, new opportunities for Blue Cross competitors were created, and no consumers were restricted in their health care options.
 
 
 63
 We agree with the district court that sufficient evidence supports the jury's finding of an unreasonable restraint of trade in the market for private health care financing. It is not dispositive to us that Wesley was in the health care services market and not itself in the health care financing market. As plaintiffs argue and the district court noted, Wesley was, by virtue of its affiliation with HCA and HCP, a perceived competitor of Blue Cross. Indeed, in the Blue Cross Executive Committee meeting August 29, 1985, when the formal decision to terminate Wesley was made, Blue Cross' President Wayne Johnston specifically asked the Committee whether Blue Cross "wish[ed] to continue to do business with entities that openly desire to compete with the organization and enroll Blue Cross ... subscribers in their programs." Plaintiffs' Ex. 10, Addendum to Brief of Appellants Vol. I. Further, Wesley was a competitor of Blue Cross' co-conspirators, the Saints. Thus, this case does not involve only, as defendants argue, the termination of a vertical relationship, akin to a dealer termination. Rather, this case also involves a horizontal conspiracy among competitors to harm another competitor. See Business Elecs. Corp., 108 S.Ct. at 1525.
 
 
 64
 Blue Cross argues that the jury specifically found that HCP, the only plaintiff in the relevant market of health care financing, had suffered no injury. According to Blue Cross, this establishes that no unreasonable restraint of trade occurred in the relevant market. The finding of no injury to HCP does not alter our conclusion that competition in the health care financing market was adversely affected. As the district court noted, HCP specifically made no effort to quantify its damages. The peculiar posture of this case, with the parties having voluntarily agreed to maintain the status quo and to delay actual termination of Wesley's contracting provider agreement pending resolution of this suit, may indeed explain why HCP continued to contract with other Wichita hospitals, including the Saints, after the threatened termination.[20]
 
 
 65
 We further disagree with Blue Cross' assertion that no evidence demonstrated that the announced termination of Wesley's contract prevented hospitals from vertically integrating into health care financing or prevented health care financing businesses from contracting with other hospitals. Indeed, several hospital administrators testified that Blue Cross' threatened termination of Wesley gravely concerned them and affected their involvement in private health care financing.[21] Cf. R.C. Dick Geothermal Corp., 890 F.2d at 152 ("Dick Geothermal failed to provide testimony from a single other developer that the developer's investment decisions were in any way influenced by the defendants' level of production ...").
 
 
 66
 Finally, we reject Blue Cross' argument that the evidence established that the effects of Blue Cross' conduct were procompetitive and proconsumer. While there was testimony that premiums for some subscribers were reduced following the threatened termination of Wesley and the implementation of the reduced maximum allowable payments, that does not convince us that Blue Cross' challenged actions were procompetitive and proconsumer. Indeed, two of plaintiffs' experts, William Guy and Dr. George Hay, plainly testified that Blue Cross' actions would, in the long run, harm consumers because they would slow down or inhibit the development of alternative delivery systems, thereby reducing the options available to consumers. They further testified that such systems would cause health care costs to decrease, thereby benefiting consumers.[22] Thus, sufficient evidence supports the jury's conclusion that Blue Cross' actions resulted in an unreasonable restraint of trade.
 
 
 67
 (iv) Market and Monopoly Power
 
 
 68
 Blue Cross argues that, absent a showing of market power, plaintiffs' section 1 claim fails. Plaintiffs evidently assumed they must establish market power, as they presented considerable evidence relating to that issue. Thus, we review the evidence of Blue Cross' market power, noting that the Supreme Court has suggested that there may be situations in which a specific and detailed showing of market power may not be necessary in a section 1 Rule of Reason case. See note 24, infra.
 
 
 69
 "To demonstrate 'market power,' a plaintiff may show evidence of either 'power to control prices' or 'the power to exclude competition.' " Westman Comm'n Co., 796 F.2d at 1225 n. 3 (emphasis original). Market power is to be distinguished from monopoly power, which in this circuit requires proof of both power to control prices and power to exclude competition. See Bright v. Moss Ambulance Serv., Inc., 824 F.2d 819, 824 (10th Cir.1987); Shoppin' Bag, Inc. v. Dillon Cos., 783 F.2d 159, 163 (10th Cir.1986). Market and monopoly power only differ in degree--monopoly power is commonly thought of as "substantial" market power. See Areeda & Turner, Antitrust Law, p 801 (1978). We discuss the two concepts together here, since the same evidence relates to each.
 
 
 70
 Power over price and power over competition may, in turn, depend on various market characteristics, including the existence and intensity of entry barriers, elasticity of supply and demand, the number of firms in the market, and market trends. See Shoppin' Bag, 783 F.2d at 162 (in evaluating market power, "[m]any cases ... look at market trends, number and strength of other competitors, and entry barriers").[23]
 
 
 71
 Market share is relevant to the determination of the existence of market or monopoly power, but "market share alone is insufficient to establish market power." Bright, 824 F.2d at 824; see also Colorado Interstate Gas Co. v. Natural Gas Pipeline Co., 885 F.2d 683, 695 (10th Cir.1989); Shoppin' Bag, 783 F.2d at 162; Landes & Posner, Market Power in Antitrust Cases, 94 Harv.L.Rev. 937, 947 (1981). It may or may not reflect actual power to control price or exclude competition. See generally Ball Memorial Hosp., 784 F.2d at 1335. Courts have not completely agreed on whether a particular market share should be given conclusive or merely presumptive effect in determining market or monopoly power, or whether market share is only a starting point in the inquiry into market or monopoly power. Compare Valley Liquors, Inc. v. Renfield Importers, Ltd., 822 F.2d 656, 667 (7th Cir.) ("Without a showing of special market conditions or other compelling evidence of market power, the lowest possible market share legally sufficient to sustain a finding of monopolization is between 17% and 25%."), cert. denied, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc., 679 F.2d 516, 529 (5th Cir.1982) ("market shares in the range of 16 to 25 percent, such as those held by [defendant] are insufficient--at least absent other compelling structural evidence--as a matter of law to support monopolization"), cert. denied, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983), with Hayden Publishing Co. v. Cox Broadcasting Corp., 730 F.2d 64, 69 n. 7 (2d Cir.1984) ("a party may have monopoly power in a particular market, even though its market share is less than 50%") and Broadway Delivery Corp. v. United Parcel Serv. of America, 651 F.2d 122, 128 (2d Cir.) ("The trend of guidance from the Supreme Court and the practice of most courts endeavoring to follow that guidance has been to give only weight and not conclusiveness to market share evidence."), cert. denied, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). See also Areeda & Turner, Antitrust Law, p 518.3c ("there is a substantial merit in a presumption that market shares below 50 or 60 percent do not constitute monopoly power.") (emphasis added). This court recently stated in dicta:
 
 
 72
 "While the Supreme Court has refused to specify a minimum market share necessary to indicate a defendant has monopoly power, lower courts generally require a minimum market share of between 70% and 80%."
 
 
 73
 Colorado Interstate Gas Co., 885 F.2d at 694 n. 18 (citing 2 E. Kintner, Federal Antitrust Law, Sec. 12.6 (1980); Areeda & Turner, Antitrust Law, p 803). We do not view Colorado Interstate Gas as establishing a firm market share percentage required before a finding of monopoly power can ever be sustained. We prefer the view that market share percentages may give rise to presumptions, but will rarely conclusively establish or eliminate market or monopoly power.
 
 
 74
 As indicated, entry barriers are relevant to the analysis of market or monopoly power. Entry barriers are particular characteristics of a market which impede entry by new firms into that market. Entry barriers may include high capital costs or regulatory or legal requirements such as patents or licenses. See generally Colorado Interstate Gas Co., 885 F.2d at 695-96 n. 21; Westman Comm'n Co., 796 F.2d at 1225-26 n. 3; L. Sullivan, Antitrust Law, p 23 (1977); Areeda & Turner, Antitrust Law, p 409 (1978) ("The principal sources [of entry barriers] are (1) legal license ...; (2) control over an essential or superior resource ...; (3) entrenched buyer preferences ...; and (4) capital market evaluations imposing higher capital costs on new entrants...."). As leading commentators have noted, "[s]ubstantial market power can persist only if there are significant and continuing barriers to entry." Areeda & Turner, Antitrust Law, p 505; accord Cargill, 479 U.S. at 119-20 n. 15, 107 S.Ct. at 494-95 n. 15.
 
 
 75
 The foregoing discussion illustrates that market power, to be meaningful for antitrust purposes, must be durable. See Areeda & Turner, Antitrust Law, p 505 ("the significance of market power depends not only on its degree but also on its durability."). See generally Colorado Interstate Gas Co., 885 F.2d at 695-96 & n. 21; L. Sullivan, Antitrust Law, pp 22-32. The jury found that Blue Cross possessed both market power and monopoly power in the relevant market. The district court refused to disturb those findings. It concluded plaintiffs presented sufficient evidence that Blue Cross had both power over competition and power over price.[24]
 
 
 76
 Blue Cross argues on appeal that the jury and the district court erred in finding market or monopoly power for the following reasons: (1) plaintiffs' expert erroneously equated power to exclude competition with power over prices, in contravention to this court's analysis in Shoppin' Bag, 783 F.2d at 163-64;[25] (2) there was no evidence of Blue Cross' pricing power, and Blue Cross could have no such power in view of the fact that its rates were subject to approval and regulation by the Kansas Commissioner of Insurance; (3) entry barriers were nonexistent; and (4) Blue Cross' market share was insufficient to permit the inference of market power and, furthermore, it was declining.
 
 
 77
 Noting once again our standard of review, we hold that sufficient evidence supports the jury's findings of market and monopoly power. Estimates of Blue Cross' market share varied. An internal memorandum prepared by a Blue Cross employee estimated that "60% of all medically insured Kansans are insured with Blue Cross and Blue Shield of Kansas." Plaintiffs' Ex. 41, Addendum to Brief of Appellants Vol. I. One of plaintiffs' experts, William Guy, testified that, based on his own calculations, Blue Cross' percentage of all medically insured Kansans, including self-insureds, was, "conservative[ly]," forty-seven percent. R. Vol. 34 at 3393-94. Another of plaintiffs' experts, Professor Raymond Davis, testified that Blue Cross receives sixty-two percent of the insurance premiums in its service area compared to less than five percent for its next largest rival. Dr. George Hay testified that Blue Cross' market share was "somewhere between forty-seven and sixty-two percent." R. Vol. 35 at 3529. However measured, Blue Cross is by far the largest private source of health care financing in its service area.[26] By virtue of its size, Blue Cross has economic leverage over hospitals. As Blue Cross' president, Wayne Johnson, conceded, Blue Cross' membership base gives Blue Cross "clout" over hospitals. R. Vol. 18 at 780-81. While Blue Cross argues vigorously that self-insureds should be included in any estimates of Blue Cross' market share, and that inclusion of self-insurance lowers Blue Cross' market share from sixty percent to forty-five percent, inclusion of self-insurance would not significantly alter Blue Cross' relative dominance of the market.[27]
 
 
 78
 Blue Cross' market share is such that there could be at most a presumption of a lack of monopoly or market power. We disagree with Blue Cross that such a market share prohibits, as a matter of law, a conclusion of market or monopoly power. The fact that the share may have declined somewhat does not persuade us to the contrary. See Oahu Gas Serv. v. Pacific Resources, Inc., 838 F.2d 360, 366-67 (9th Cir.) (" 'A declining market share may reflect an absence of market power, but it does not foreclose a finding of such power.' ") (quoting Greyhound Computer Corp. v. IBM, 559 F.2d 488, 496 n. 18 (9th Cir.1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978)), cert. denied, --- U.S. ----, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). We turn, therefore, to other characteristics of the private health care financing market at issue and to more specific evidence of Blue Cross' power over price and competition.
 
 
 79
 Certain historical advantages contributed to Blue Cross' dominant position in Kansas. Blue Cross was the first health care insurance company in Kansas. It is chartered under special enabling legislation.[28] Until 1985, Blue Cross was the only insurance company with the ability to contract directly with hospitals, which gave it the unique ability to negotiate price, to establish maximum allowable payments, to impose a hold harmless clause, and to utilize its most favored nations clause. Until 1970, it had certain tax advantages not available to other insurance companies, R. Vol. 22 at 1487-90, which, while arguably not relevant as entry barriers to competition now, may have contributed to Blue Cross' initial dominance in Kansas. Blue Cross is also the only Medicare intermediary, and Medicare accounts for a substantial portion of each hospital's revenues. Plaintiffs' experts testified as to why Blue Cross had achieved its position of dominance and why it was unlikely that Blue Cross' dominant position in the market in this case would be eroded soon.
 
 
 80
 Plaintiffs' experts also testified as to Blue Cross' power over price and power to exclude competition. William Guy testified that alternative delivery systems were "the first real challenge to our traditional system of delivering financing of care." R. Vol. 34 at 3375. He testified that Blue Cross' most favored nations clause hindered the development of alternative delivery systems, thereby interfering with the introduction of competition. R. Vol. 34 at 3404. He further testified that, despite Blue Cross' average annual rate increase of 23.75% from 1980 through 1983, Blue Cross still maintained its dominance. The jury could reasonably infer from that testimony that Blue Cross had power over price.
 
 
 81
 Another of plaintiffs' experts, Dr. George Hay, similarly testified that Blue Cross' only real competition would come from alternative delivery systems. Blue Cross faced little challenge from other traditional indemnity insurance companies. Because Blue Cross was in a position to use its leverage over hospitals to exclude or slow down the development of alternative delivery systems, it thereby had power to exclude competition. He further opined that the power to exclude such alternative delivery systems gave Blue Cross power over price.[29]
 
 
 82
 Further, there was testimony that Blue Cross' threatened termination of Wesley in fact did exclude competition, in that it inhibited hospitals from pursuing alternative delivery systems. There was also considerable testimony on the effect of Blue Cross' most favored nations clause, and the jury could reasonably have concluded that that clause contributed to Blue Cross' power over price.[30] We reject Blue Cross' argument that Blue Cross could have no power over price because its rates were subject to approval and regulation by the Kansas Commissioner of Insurance.[31]
 
 
 83
 We further disagree with Blue Cross' argument that entry barriers in the relevant market were non-existent and that the existence of some 200 insurance companies operating in Kansas demonstrates that fact. While it is true that only capital and licensing were necessary to initially enter the health care financing market, the fact remains that no other entrant remotely approached Blue Cross' domination of the market. That evidence cuts against the argument that entry barriers were insubstantial. See Oahu Gas Services, 838 F.2d at 367 ("The second entrant, Aloha Gas, did win some accounts, but the evidence that that firm remained very small could reasonably preclude a decision that Aloha's entry reflected a breakdown of barriers to entry."). Further, other peculiar characteristics of the health care financing market in Kansas, such as Blue Cross' unique ability, until 1985, to contract directly with hospitals, and the widespread impression that Blue Cross alone had the Kansas legislature's special imprimatur made it more difficult for other insurance companies to compete with Blue Cross.[32]
 
 
 84
 In sum, bearing in mind our standard of review in this case, we conclude that sufficient evidence supports the jury's findings of monopoly and market power and we find no legal error in those findings.
 
 
 85
 (v) Damages
 
 
 86
 Blue Cross argues the damages award to Wesley should be set aside because Wesley's evidence of lost profits resulting from the loss of patients following Blue Cross' threatened termination of Wesley was speculative and unsubstantiated.[33]
 
 
 87
 "The Supreme Court has recognized that an antitrust plaintiff is rarely able to prove its damages with mathematical precision." Aspen Highlands, 738 F.2d at 1525. While an antitrust damages award may not be the result of mere " 'speculation or conjecture,' " it may be the result of " 'a just and reasonable estimate of the damage based on relevant data.' " Id. at 1526 (quoting Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946)).
 
 
 88
 Blue Cross specifically challenges the damages award for lost profits because it argues that Wesley's chief operating officer, Donald Stewart, presented "unsupported speculation" that Wesley's declining percentage of Blue Cross subscribers resulted from the announced termination. Blue Cross claims the evidence demonstrates merely a small decline in Wesley's market share which was simply coincidental with the announced termination. In other words, Blue Cross appears to argue insufficient evidence supported the necessary causal link between Blue Cross' challenged activities and Wesley's claimed damage. We disagree. We have carefully reviewed the damages evidence presented in this case and find that Wesley's claimed damages were supported by sufficient evidence.
 
 
 89
 Blue Cross makes only a passing reference in its appellate briefs to an argument it made strenuously below, that any damage award in this case would be speculative because the contracting provider agreement with Wesley was never terminated.[34] As did the district court, we note that the unique posture of this case necessarily altered plaintiffs' evidence of damages. Nonetheless, Wesley adequately documented the damages it actually sustained by virtue of the threatened termination of its contracting provider agreement.
 
 B. Section 2
 Section 2 of the Sherman Act provides:
 
 90
 "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce ... shall be deemed guilty of a felony ..."
 
 
 91
 15 U.S.C. Sec. 2. The jury was instructed on the elements of attempted monopolization, conspiracy to monopolize, and the completed offense of monopolization. It found Blue Cross guilty of the offense of monopolization.
 
 
 92
 "The elements of monopolization under Section 2 are 'the possession of monopoly power in the relevant market' and 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' "
 
 
 93
 Bright v. Moss Ambulance Serv., 824 F.2d 819, 823 (10th Cir.1987) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966)); see also Aspen Highlands Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985). "Of course, the fact of injury and damages suffered by reason of a violation of the antitrust laws must also be shown for a private litigant to recover on a claim of monopolization." Aspen Highlands, 738 F.2d at 1519 n. 12. While a "specific intent" to monopolize is necessary to establish an attempt to monopolize claim, "general intent is all that is required to support a monopolization claim." Id. at 1521 n. 16.
 
 
 94
 We have already held that sufficient evidence supports the jury's finding of monopoly power. We have also already concluded that Wesley had standing and proved antitrust injury and damages. We turn, therefore, to whether sufficient evidence supports the finding that Blue Cross willfully acquired or maintained that power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Bright, 824 F.2d at 823 (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966)). We have little difficulty concluding that Blue Cross' total conduct in this case--threatening to terminate Wesley's contracting provider agreement and reducing the maximum allowable payments for the remaining Peer Group V hospitals, thereby coercing other hospitals into not doing business with Blue Cross competitors--constituted willful maintenance of its monopoly power. A general intent to do so is amply supported by the record.
 
 C. Jury Instructions
 
 95
 Blue Cross argues that the court erroneously instructed the jury on certain of the elements necessary under sections 1 and 2.
 
 
 96
 "When examining a challenge to jury instruction, we review the record as a whole to determine whether the instructions 'state the law which governs and provided the jury with an ample understanding of the issues and the standards applicable.' "
 
 
 97
 Big Horn Coal Co. v. Commonwealth Edison Co., 852 F.2d 1259, 1271 (10th Cir.1988) (quoting Ramsey v. Culpepper, 738 F.2d 1092, 1098 (10th Cir.1984)). We address each alleged error in turn.
 
 
 98
 During jury deliberations, the jury asked whether it could consider "the public interest" if it found the procompetitive and anticompetitive effects of Blue Cross' conduct "balance[d] out against each other." The court responded "yes," over Blue Cross' objection. Blue Cross argues the "court's answer impermissibly allowed the jury to consider matters other than market effects, and to find a violation where anticompetitive effects did not outweigh procompetitive effects." Brief of Appellants at 27.
 
 
 99
 This interchange between jury and court must be viewed in context. Instruction 46, to which Blue Cross did not object, stated in part:
 
 
 100
 "To determine whether there was an unreasonable restraint, you need not find a specific injury, but must find conduct which appears to be reasonably calculated to, or tends to, prejudice the public interest. That public interest is that competition be open and unrestrained."
 
 
 101
 R. Vol. III, Tab 207 at Instruction 46. The jury's question was as follows:"If the jury finds, (in accordance with Instructions 47 through 52) that the reasonable and unreasonable (pro versus anti-competitive) effects in the market balance out against each other, is the fact that there did exist conduct [as per Instruction 46] which appeared to be reasonably calculated, or tended to prejudice the public interest, to be given any weight in deciding the question of unreasonable restraint?"
 
 
 102
 R. Vol. III at Tab 211.
 
 
 103
 We find no reversible error in the court's response. Instructions 46 through 52 made abundantly clear to the jury that they were to find an unreasonable restraint of trade only if they found an adverse impact on competition. The "public interest" referred to in Instruction 46 was specifically defined as "open and unrestrained competition." Thus, we do not view the court's response as inviting the jury to consider matters other than the effects of the alleged restraint on competition, nor as allowing a finding of an unreasonable restraint where the anticompetitive effects did not outweigh the procompetitive effects.
 
 
 104
 Again during deliberations, the jury inquired whether entry barriers encompassed simply "gaining a share of the market or does this refer to a new product simply being licensed into Kansas." R. Vol. III at Tab 211. The court responded:
 
 
 105
 "Instruction 43 contains certain factors you may consider in determining Blue Cross' market power or monopoly power, if any. Factor 5 of that instruction inquires of you as to the ease with which new firms may enter the industry, and in the Court's view, is self-explanatory.
 
 
 106
 In the interest of clarity, however, 'barriers to entry' fairly implies or assumes the ability to become a meaningful competitor."
 
 
 107
 Id. Blue Cross argues the court's answer was wrong because entry barriers only contemplate the prerequisites to entry and the concept does not require that a new entrant be able to compete meaningfully.
 
 
 108
 While we agree with Blue Cross that the antitrust laws do not guarantee any competitor the right to be a meaningful or significant competitor, we also must view entry barriers in terms of their relevance to the antitrust laws. Entry barriers are relevant to the inquiry into a defendant's market power. If entry barriers are substantial, a market participant may be able to achieve or maintain market or monopoly power and use that power anticompetitively because its actions can go unchecked by new competitors. Thus, the relevance of entry barriers stems from their impact on competition in a given market. See United States v. Waste Management, Inc., 743 F.2d 976, 983 (2d Cir.1984) (in finding low entry barriers, court noted that new entrants could "compete successfully" with other companies). Where the particular "entry barrier" in question, such as regulatory approval, means no more than that a new entrant has a "ticket" or "pass" to enter the market, but where other substantial entry barriers prohibit the new entrant from ever gaining a sufficient share of the market to discipline anticompetitive action by other market participants, then the first kind of "entry barrier" is not meaningful in antitrust terms. Thus, we agree with the district court that it properly focused the jury's attention on barriers to meaningful competition--competition which could inhibit anticompetitive conduct. See Reazin II, 663 F.Supp. at 1435-37.
 
 
 109
 Blue Cross makes two challenges to Instruction 18. First, Blue Cross argues that the court's instruction, over objection, that the issue was "whether Blue Cross' termination of Wesley and related actions and communications are likely to have a future anticompetitive effect in any relevant market," was wrong because the Sherman Act only prohibits past or existing restraints of trade, not future ones. Second, Blue Cross argues the court wrongly limited the jury's use of evidence of HCA's allegedly anticompetitive conduct by the following language:
 
 
 110
 "I hereby instruct you that the evidence concerning HMO Kansas and surrounding circumstances in 1983 and 1984 was admitted for the limited purpose of allowing Blue Cross to set forth historical information about Wichita and the health care financing market. I further instruct you that this evidence is relevant only for that limited purpose and should not be considered for any other purpose. I further instruct you that it should be considered by you, if at all, only if you believe it helps you decide what will the likely future competitive impact of the Blue Cross conduct at issue in this case--Blue Cross' announced termination of Wesley Medical Center and its related actions and communications."
 
 
 111
 R. Vol. III, Tab 207 at Instruction 18. Blue Cross argues that limiting instruction inhibited its legitimate Rule of Reason defense.
 
 
 112
 We find no error in Instruction 18. The peculiar posture of this case requires a finding of no error in the phrase concerning the "likely future competitive impact of the Blue Cross conduct." We likewise reject the argument that the instruction inhibited Blue Cross' legitimate Rule of Reason defense. As the district court noted, it had struggled throughout this case to walk the fine line between permitting Blue Cross to present its Rule of Reason defense, and thereby present evidence as to general market conditions, and yet not permitting a full trial of Blue Cross' counterclaim. We view the challenged instruction as simply reminding the jury of that distinction and properly channeling their attention toward the permitted use of the evidence of general market conditions--Blue Cross' Rule of Reason defense.
 
 
 113
 Blue Cross also objects to the court's instruction on the product market in this case. The court instructed the jury that the relevant product market was "private health care financing." R. Vol. III, Tab 211 at Instruction 37. Blue Cross argues the court should have instructed the jury to make findings as to the products constituting the relevant market. In particular, Blue Cross' concern is whether the jury included self-insurance in the relevant market.
 
 
 114
 Market definition is a question of fact. Westman Comm'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1220 (10th Cir.1986). Definition of the relevant market requires first "a determination of the product market." Id. at 1221. "This inquiry necessitates an examination of which commodities are 'reasonably interchangeable for consumers for the same purposes.' " Id. (quoting United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956)). The relevant geographic market must also be determined. Westman Comm'n Co., 796 F.2d at 1222. The jury defined the geographic market in this case as the State of Kansas, excluding Johnson and Wyandotte Counties.
 
 
 115
 We find no error in the district court's refusal to specifically direct the jury to make findings as to the products constituting the relevant market. The jury heard ample, and conflicting, evidence as to the propriety of including self-insurance in the relevant market, the percentage of Kansans insured through self-insurance, and the effect that inclusion of self-insurance in the relevant market would have on the issues in this case. Thus, the issue of what "products" constitute the market of private health care financing was fairly before the jury.
 
 
 116
 In its instructions on unreasonable restraints of trade, the court stated, "if you find defendant possessed market power in the market, then any action taken by it with the actual or probable effect of foreclosing competition, gaining a competitive advantage, or destroying a competitor would be an unreasonable restraint of trade." R.Vol. III, Tab 207 at Instruction 47. Blue Cross objects to the highlighted portion of the instruction on the ground that it impermissibly allowed the jury to find an antitrust violation from the legitimate activity of seeking to gain a competitive advantage. Viewed in the context of all the instructions given the jury, we perceive no error. The jury was instructed on several occasions that the antitrust laws do not prohibit vigorous and successful competition and that merely attempting to succeed in business through vigorous competition is not unlawful. See id. at Instructions 12, 51. We are therefore unpersuaded that the jury would have taken that single challenged phrase and penalized Blue Cross for engaging in legitimate competitive activity.
 
 
 117
 Blue Cross further objects to the court's instruction that HCA's actions were "in and of themselves ... not illegal or violative of the antitrust laws." Id. at Instruction 19. Blue Cross argues that instruction was not necessary and only served to prejudice Blue Cross. We disagree. While the legality of HCA's actions was an issue in the counterclaim, plaintiffs' complaint addressed only the legality of Blue Cross' actions, to which the legality of HCA's actions was irrelevant. The sentence preceding the challenged sentence correctly reminded the jury that "vertical integration ... in and of itself is not violative of any law, including antitrust laws." Id. Viewed in context, this instruction simply reminded the jury that it could not consider any illegality by HCA as a defense to charges of anticompetitive conduct by Blue Cross.
 
 
 118
 Finally, Blue Cross charges that the court "repeatedly commented to the jury adversely concerning the evidence Blue Cross offered in support of its defense." Brief of Appellants at 31. It further charges that the court compounded the prejudice by refusing to instruct the jury that the court's comments were not evidence. After carefully reviewing the entire record in this case, we find no prejudice to Blue Cross resulting from any allegedly unfavorable comments by the district court to the jury concerning Blue Cross' evidence. Nor do we find any error in the district court's exclusion of evidence relating to HCA's activities in other parts of the country.
 
 
 119
 We therefore affirm the district court's denial of Blue Cross' motions for judgment n.o.v. or for a new trial on the antitrust claims.
 
 STATE LAW CLAIMS
 
 120
 Plaintiffs also charged that Blue Cross' conduct in this case amounted to tortious interference with Wesley's present and future relations with Blue Cross subscribers, in violation of Kansas law.[35] The jury found for Wesley on its claim of tortious interference and awarded actual damages of $1.00 and punitive damages of $750,000.[36] The district court denied Blue Cross' motion for judgment n.o.v. or a new trial on that claim. Blue Cross appeals, arguing that the court erroneously instructed the jury on the elements of tortious interference and that the evidence fails to support the jury's verdict.
 
 
 121
 The district court instructed the jury as follows:
 
 
 122
 "To find for plaintiff Wesley Medical Center on its claim of tortious interference by Blue Cross, Wesley must prove and you must find:
 
 
 123
 1. That there existed a present business relationship and/or the expectancy of a future relationship with economic benefits between Wesley and Blue Cross' subscribers;
 
 
 124
 2. That Blue Cross actually knew of this present business relationship and/or expectancy of future relationship;
 
 
 125
 3. That, but for Blue Cross' deliberate use of the media and other efforts to discourage its subscribers from using Wesley, plaintiff Wesley was reasonably certain to have continued in the existing relationship or realized future expectancies;
 
 
 126
 4. That Blue Cross undertook this conduct with the wrongful intent of injuring or destroying Wesley's business;5. That Wesley suffered injury, loss or damages to its business relations as a direct or proximate result of Blue Cross' misconduct."
 
 
 127
 R.Vol. III, Tab 207 at Instruction 84. Blue Cross argues that that instruction permitted the jury to find tortious interference without finding that Blue Cross had engaged in misconduct.
 
 
 128
 The elements of tortious interference under Kansas law are:
 
 
 129
 "(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct."
 
 
 130
 Turner v. Halliburton Co., 240 Kan. 1, 722 P.2d 1106, 1115 (1986) (citing Maxwell v. Southwest Nat'l Bank, 593 F.Supp. 250, 253 (D.Kan.1984)). Thus, improper conduct is a requirement. However, as the Kansas Supreme Court noted in Turner, "[a] person may be privileged or justified to interfere with contractual relations in certain situations." Turner, 722 P.2d at 1115. Or, put another way, defendant's conduct may not be improper.[37] The court in Turner required the plaintiff to prove "actual malice" to overcome the qualified privilege recognized there.
 
 
 131
 We conclude the jury instructions did not misstate Kansas law and permit the jury to find tortious interference without a finding of misconduct by Blue Cross. Instruction 84 itself includes the word "misconduct." Instruction 87 specifically states, "[i]n order to find that Blue Cross tortiously interfered with the business relations of plaintiffs, you must find that the alleged interference was both wrongful and intentional." R. Vol. III, Tab 207 at Instruction 87 (emphasis added). That sufficiently informed the jury of the need to find misconduct by Blue Cross.
 
 
 132
 Blue Cross also argues the court "improperly permitted the jury to find liability based solely upon 'deliberate use of the media' even though all of the alleged statements of Blue Cross were factually true and not defamatory." Brief of Appellant at 36. Blue Cross argues its media communications were privileged under the First Amendment unless Wesley proved actual malice or knowledge of falsity.
 
 
 133
 The court's instruction No. 88, concerning competitive privilege, stated:
 
 
 134
 "This competitive privilege is a qualified privilege, and if you find Blue Cross' conduct is motivated primarily by malicious, anticompetitive or predatory purposes, rather than legal, fair and reasonable competition, you must conclude defendant's conduct falls outside this qualified privilege, and is not justified."
 
 
 135
 R.Vol. III, Tab 207 at Instruction 88. We agree with the district court that the instruction "adequately informed the jury of the degree of motive it must find before it could impose liability upon defendant." Reazin II, 663 F.Supp. at 1430. Inasmuch as the jury found several antitrust violations by Blue Cross, which we have upheld in this appeal, sufficient evidence supports the jury's verdict of tortious interference.
 
 
 136
 "ALLEN" CHARGES AND COMMUNICATIONS WITH JURY
 
 
 137
 Finally, Blue Cross argues that the district court's supplemental Allen instructions,[38] ] given to the jury on the tenth and fourteenth days of deliberation, coerced the jury into reaching its verdict, thereby impermissibly prejudicing Blue Cross. We disagree.
 
 
 138
 Blue Cross asserts that the supplemental Allen charges, given during jury deliberations, contravened United States v. Blandin, 784 F.2d 1048 (10th Cir.1986), in which this court, in dicta, stated, "If the Allen instruction is given at all, it should be incorporated into the body of the court's original instructions to the jury. It should not be given during the course of deliberations." Id. at 1050. As we have subsequently made clear, "Blandin did not adopt a per se rule prohibiting an Allen instruction once a jury commenced deliberations." United States v. Mobile Materials, Inc., 881 F.2d 866, 878 (10th Cir.1989) (per curiam), cert. denied, --- U.S. ----, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990); see also United States v. McKinney, 822 F.2d 946, 951 (10th Cir.1987) ("Although it is a preferred rule of procedure that an Allen instruction be given the jury at the same time as other instructions, it is not a per se rule") (emphasis original). Rather,
 
 
 139
 "Allen -type cases must be reviewed on a case-by-case basis to determine the coercive effect of the instruction." McKinney, 822 F.2d at 951; see also Mobile Materials, 881 F.2d at 878.
 
 
 140
 After reviewing the facts of this case, we conclude that the Allen charges given in this case were not coercive and do not merit reversal of the jury's verdict. The language used by the district court is substantially the same as language this court has found to be non-coercive. See, e.g., United States v. Dyba, 554 F.2d 417, 420-21 (10th Cir.), cert. denied, 434 U.S. 830, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); Munroe v. United States, 424 F.2d 243, 245-46 (10th Cir.1970); United States v. Wynn, 415 F.2d 135, 137 (10th Cir.1969), cert. denied, 397 U.S. 994, 90 S.Ct. 1133, 25 L.Ed.2d 402 (1970). Any differences between the Allen charges given in those cases and the Allen charges given in this case do not alter our conclusion.
 
 
 141
 While the district court did remind the jury that plaintiffs labored under the preponderance of the evidence standard rather than the higher beyond a reasonable doubt standard, the court also directed the jurors to review carefully the court's original instructions, which set forth all the elements of plaintiffs' case. The court also reminded the jurors, as it did in its original instructions, that "no juror is expected to yield a conscientious conviction that he or she may have as to the weight or the effect of the evidence." R. Vol. III, Tab 207 at Instruction 97. In sum, while we continue to urge caution in the use of Allen instructions, we do not find, under the particular facts of this case, that the given instructions coerced the jury and prejudiced Blue Cross.[39]
 
 
 142
 Blue Cross also argues that the district court "erred in permitting private communications between its law clerks and the jury." Brief of Appellants at 17. We find no error. The court's communications with the jury all related to the progress the jury was making towards reaching a verdict and occurred after the jury had been deliberating for a considerable period of time. The record confirms the district court's conclusion that "[n]othing was done without the prior knowledge and approval, or at least acquiescence, of counsel...." Reazin II, 663 F.Supp. at 1442.[40]
 
 COUNTERCLAIM
 
 143
 In their counterclaim, Blue Cross, along with HMOK,[41] charged that plaintiffs and HCA (1) engaged in a group boycott and concerted refusal to deal, per se in violation of section 1; (2) restrained trade in violation of the Rule of Reason under section 1; (3) monopolized, attempted to monopolize, and/or conspired to monopolize the health care financing and health care services market in violation of section 2; (4) violated section 7 of the Clayton Act, 15 U.S.C. Sec. 18;[42] and (5) interfered with prospective advantage in violation of Kansas law.[43] As the district court noted, "[w]ith the exception of the Sec. 7 claim, all of the claims in the counterclaim are based in whole or in part on the allegation HCA, HCP and physicians in Wichita conspired to boycott HMOK 'as a condition and in connection with [the] negotiation and sale of Health Care Plus to HCA.' " Reazin II, 663 F.Supp. at 1460 (quoting R.Vol. I, Tab 25, Answer & Counterclaim at 20-21).[44] The district court granted plaintiffs' motion for summary judgment on the entire counterclaim. In so doing, it characterized the counterclaim as "a defensive ploy, a maneuver, probably suggested and instigated by defense counsel, to divert attention from plaintiffs' complaint." Reazin II, 663 F.Supp. at 1461. It further observed that it addressed the motion for summary judgment "in the extraordinary posture of having received the documentary evidence and having heard, firsthand, the live testimony of the witnesses." Id. at 1462.
 
 
 144
 Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate when "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Under the Supreme Court's recent guidelines for the granting of summary judgment, summary judgment must be granted against a party "who fails to ... establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). For a plaintiff to avoid summary judgment, there must be sufficient evidence from which a jury could find for the plaintiff. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A mere "scintilla" of evidence is insufficient. We must, of course, construe the evidence and draw all inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); McKenzie v. Mercy Hosp., 854 F.2d 365, 367 (10th Cir.1988); Key Fin. Planning Corp. v. ITT Life Ins. Corp., 828 F.2d 635, 638 (10th Cir.1987).
 
 
 145
 After carefully considering all of the evidence in the light most favorable to Blue Cross and HMOK, we affirm the grant of summary judgment in favor of plaintiffs for substantially the reasons set forth in the district court's thorough treatment of the counterclaim. See Reazin II, 663 F.Supp. at 1459-83.
 
 ATTORNEY'S FEES AND COSTS
 
 146
 Neither Blue Cross nor plaintiffs devote more than one and one-half pages of their respective 50-page briefs to the issue of attorneys' fees. Blue Cross' challenges to the award of attorneys' fees and costs are therefore somewhat conclusory.
 
 
 147
 Blue Cross argues (1) the district court erred in awarding "all expenses claimed by plaintiffs (e.g., expert witness fees), regardless of whether the expenses were allowable under 28 U.S.C. Secs. 1821 and 1920;" (2) the fee award improperly included fees to plaintiffs who were not prevailing parties; (3) plaintiffs failed to apportion their time among claims on which they prevailed and claims on which they did not or between prosecuting the main claim and defending the counterclaim; and (4) the fees were excessive for the work done.
 
 
 148
 "[A]n attorneys' fee award by the district court will be upset on appeal only if it represents an abuse of discretion." Mares v. Credit Bureau of Raton, 801 F.2d 1197, 1201 (10th Cir.1986); see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 561, 106 S.Ct. 3088, 3096, 92 L.Ed.2d 439 (1986). "Findings on underlying questions of fact are subject to the clearly erroneous standard of review." Mares, 801 F.2d at 1201. Certain of Blue Cross' arguments are easily dismissed. Plaintiffs' Memorandum in Support of Plaintiffs' Application for Attorneys' Fees and Bill Costs, and supporting affidavits, specifically state that hours attributed to defense of the counterclaim were excluded. See Memorandum, R.Vol. 4, Tab 258 at 15; Affidavit of Joe Sims at 3; Affidavit of Donald R. Newkirk at 3. Furthermore, we see no need for Wesley specifically to apportion its time between claims on which it prevailed and on those on which it did not because Wesley was clearly a prevailing party under Supreme Court guidelines. See Texas State Teachers' Ass'n v. Garland Indep. School Dist., 489 U.S. ----, 109 S.Ct. 1486, 1492, 103 L.Ed.2d 866 (1989) ("A prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought ..."). It does not matter that Wesley did not prevail on every issue or every claim brought. See id.; see also Ramos v. Lamm, 713 F.2d 546, 556 (10th Cir.1983) ("If the plaintiff has obtained 'excellent results,' the attorney's fees should encompass all hours reasonably expended; no reduction should be made because the plaintiff failed to prevail on every contention: 'the result is what matters.' ") (quoting Hensley v. Eckerhart, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983)). All of Wesley's claims arose out of a common core of facts. The relief sought by Wesley was to have Blue Cross' anticompetitive actions stopped and to recover damages suffered because of such actions. On that it succeeded.
 
 
 149
 Blue Cross argues the fee award improperly included fees for certain plaintiffs (i.e. New Century, Reazin and HCP) who were not "prevailing" parties. We reject this argument for the reasons set forth in the district court opinion. See Reazin II, 663 F.Supp. at 1455.
 
 
 150
 Blue Cross' argument about expert witness fees allowed as costs is somewhat conclusory. We assume Blue Cross argues that the total amount awarded, $168,227.25, must exceed the $30.00 per-day limit set forth in 28 U.S.C. Sec. 1821(b).[45] That, Blue Cross argues, contravenes Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987).[46]
 
 
 151
 The district court stated as follows concerning the expert witness fees:
 
 
 152
 "Reasonable expert witness fees may be awarded if that expert testimony was reasonably necessary. Ramos, 713 F.2d at 559. Plaintiffs seek to recover $168,227.25 as expert witness fees paid to Dr. George Hay, Dr. Ray Davis, and William Guy. Each of these expert witnesses' testimony was indispensable for plaintiffs' recovery. These witnesses provided crucial testimony concerning central issues such as market definition, market power, and defendant's business practices and position in the market. They also provided invaluable foundation testimony regarding the nature of the health care industry and health care financing mechanisms. Their appearance and testimony was reasonably necessary; recovery of those fees is therefore granted."
 
 
 153
 Reazin II, 663 F.Supp. at 1457. The district court thus appeared to award the fees as part of the award of attorneys' fees under section 4 of the Clayton Act, 15 U.S.C. Sec. 15. In Ramos, the case relied on by the district court, we specifically awarded, as part of an award of attorneys' fees under 42 U.S.C. Sec. 1988, "reasonable expert witness fees" if the witness' testimony was "reasonably necessary." 713 F.2d at 559.
 
 
 154
 Crawford Fitting has, however, caused many courts to reconsider the propriety of taxing expert witness fees against the losing party. As indicated, the Court in Crawford Fitting specifically addressed only the authority of a federal court under Rule 54(d) to tax expert witness fees beyond the statutory limits contained in 28 U.S.C. Secs. 1920 and 1821. Nonetheless the Court employed broad language. "We will not lightly infer that Congress has repealed Secs. 1920 and 1821, either through Rule 54(d) or any other provision not referring explicitly to witness fees." Crawford Fitting, 482 U.S. at 445, 107 S.Ct. at 2501 (emphasis added). This circuit has noted, even after Crawford Fitting, that "in the appropriate case, expert witness fees may be reimbursed as part of an attorneys' fee award." Furr v. A T & T Technologies, Inc., 824 F.2d 1537, 1550 (10th Cir.1987).[47]
 
 
 155
 The narrower question before us in this case, however, is whether the expert witness fees were properly allowed in full as part of "the cost of suit, including a reasonable attorney's fee" under section 4 of the Clayton Act, 15 U.S.C. Sec. 15. This court has not specifically addressed that issue, either before or after Crawford Fitting. Among those courts which have addressed the question, it appears the majority do not allow such fees in excess of the amount allowed by 28 U.S.C. Sec. 1821. See, e.g., Barber & Ross Co. v. Lifetime Doors, Inc., 810 F.2d 1276, 1282 (4th Cir.) ("we agree with the prevailing view that 'costs of suit' under Sec. 4 [15 U.S.C. Sec. 15] does not include expert expenses except in cases of exceptional circumstances"), cert. denied, 484 U.S. 823, 108 S.Ct. 86, 98 L.Ed.2d 48 (1987); Illinois v. Sangamo Constr. Co., 657 F.2d 855, 866 (7th Cir.1981) ("recovery of specific expenses pursuant to Section 4 of the Clayton Act [15 U.S.C. Sec. 15] is governed by the recovery of costs under Rule 54(d) and 28 U.S.C. Sec. 1920"); Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 309 n. 75 (2d Cir.1979) ("the only costs recoverable by a successful plaintiff in a private antitrust action suit are those normally allowable under 28 U.S.C. Sec. 1920 and Fed.R.Civ.P. 54(d)."), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); Ott v. Speedwriting Publishing Co., 518 F.2d 1143, 1149 (6th Cir.1975) ("the fees of expert witnesses are not included in the recoverable costs in an antitrust action"); Seven Gables Corp. v. Sterling Recreation Org., 686 F.Supp. 1418, 1421 (W.D.Wash.1988) ("The court does not interpret the provision of the Clayton Act providing for recovery of attorney's fees as explicit statutory authorization for compensating plaintiffs for fees paid to experts beyond that authorized by the cost statutes"); Arthur S. Langenderfer, Inc. v. S.E. Johnson, Co., 684 F.Supp. 953, 960 (N.D.Ohio 1988) ("The costs recoverable under Section 4 of the Clayton Act are limited to those costs recoverable under Fed.R.Civ.P. 54(b) and 28 U.S.C. Sec. 1920"); Int'l Wood Processors v. Power Dry, Inc., 598 F.Supp. 299 (D.S.C.1984), aff'd, 792 F.2d 416 (4th Cir.1986); Beech Cinema, Inc. v. Twentieth Century Fox Film Corp., 480 F.Supp. 1195, 1198 (S.D.N.Y.1979), aff'd, 622 F.2d 1106 (2d Cir.1980); see also Int'l Woodworkers v. Champion Int'l Corp., 790 F.2d 1174, 1180 (5th Cir.1986) ("a statute which provides only for an award of 'costs' or 'attorneys' fees' but which fails to address expert witness' fees will not be construed to authorize the taxing of expert witness fees in excess of the Sec. 1821 amount"), aff'd sub nom Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987); but see Hasbrouck v. Texaco, Inc., 631 F.Supp. 258 (E.D.Wash.1986) (allowing expert witness fees as costs in antitrust case), aff'd in part and rev'd in part, 879 F.2d 632 (9th Cir.1989). We see no reason to depart from that prevailing view, and we find support for that view in Crawford Fitting.[48] Because we cannot tell from the record before us what proportion of the expert witness fees awarded in this case exceeded the statutory limits of 28 U.S.C. Secs. 1920 and 1821, we remand to the district court for a recalculation of the expert witness fees taxable against Blue Cross.
 
 
 156
 Finally, Blue Cross argues the attorneys' fees awarded are "excessive." It asserts that (1) the district court erroneously awarded as reasonable "whatever fees HCA paid to plaintiffs' counsel," allegedly contrary to Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); (2) the fees awarded were four times the fees charged to Blue Cross; and (3) the hourly rates permitted greatly exceeded the hourly rates charged by counsel in the community for comparable work.
 
 
 157
 "[T]he benchmark for the awards under nearly all of ... [the statutes awarding fees] is that the attorney's fee must be 'reasonable.' " Id. at 562, 106 S.Ct. at 3097; Mares, 801 F.2d at 1201. To determine what is a "reasonable" fee, the court must determine reasonable hours and reasonable rates for the work done. The district court carefully reviewed the hours spent on this case and determined that they were reasonable. We find no error in that determination.
 
 
 158
 The court then considered a reasonable rate for the hours spent. "The first step in setting a rate of compensation for the hours reasonably expended is to determine what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time." Ramos, 713 F.2d at 555; see also Blum v. Stenson, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).[49] As the district court noted, the hourly rates requested and awarded to some of plaintiffs' attorneys "represent the actual current billing rates for the Jones, Day attorneys who represented them." Reazin II, 663 F.Supp. at 1453. Local Wichita counsel sought and received lower hourly rates than their normal billing rates. Id.
 
 
 159
 A lawyer's customary billing rate is not a conclusive factor. See Spulak v. K Mart Corp., 894 F.2d 1150 (10th Cir.1990); Ramos, 713 F.2d at 555. The district court specifically found that:
 
 
 160
 "There is abundant evidence from which I find Wichita attorneys do occasionally charge $200.00 an hour or more for complex litigation. With all my respect and endearment for Wichita attorneys and law firms, it remains true there is neither a lawyer nor a firm in this town which could have devoted to this case the timely expertise, experience, and manpower put forth by Jones, Day."
 
 
 161
 Reazin II, 663 F.Supp. at 1454. We decline to disturb those findings. We therefore affirm the determination of hourly rates awarded to plaintiffs' attorneys.
 
 
 162
 Having concluded that the district court properly determined that both the number of hours requested and the hourly rates were reasonable, and finding no other reason to disturb the district court's award, we affirm the award of attorneys' fees, with the exception that we remand to the district court to recalculate the expert witness fees awarded.
 
 CONCLUSION
 
 163
 We have carefully considered the multitude of arguments made by the parties in this appeal, addressing those we deemed appropriate. For the reasons stated in this opinion, we affirm the judgment of the district court in its entirety, with the sole exception that we remand the award of expert witness fees for further findings.
 
 
 
 [1]
 As provided in section 4 of the Clayton Act:
 "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which defendant resides ... without respect to the amount in controversy, and shall recover threefold the damages sustained, and the cost of the suit, including a reasonable attorney's fee."
 15 U.S.C. Sec. 15. Section 16 of the Clayton Act provides as follows:
 "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws...."
 15 U.S.C. Sec. 26.
 
 
 [2]
 The jury found that HCP had suffered no injury as a result of the antitrust violations and concluded that HCP had failed to establish all the elements of tortious interference. The district court had earlier concluded that plaintiffs Reazin and New Century lacked standing to seek damages. See note 3, infra
 
 
 [3]
 In an earlier written opinion, the district court had granted in part and denied in part defendant's motion for summary judgment on plaintiffs' entire complaint. Reazin v. Blue Cross & Blue Shield, Inc., 635 F.Supp. 1287 (D.Kan.1986) ("Reazin I"). The district court held that plaintiffs Reazin and New Century lacked standing to bring a private damage antitrust action under Section 4 of the Clayton Act, 15 U.S.C. Sec. 15. To that extent, the court granted defendant's motion for summary judgment. In all other respects, that motion was denied
 
 
 [4]
 Blue Cross of Kansas, Inc. was formed in 1941 pursuant to special enabling legislation
 
 
 [5]
 HMOs and preferred provider organizations ("PPO"s) are so-called "alternative delivery systems" which have emerged as cost-effective alternatives to traditional indemnity insurance. HMOs and PPOs are prospective reimbursement arrangements, in which a member or subscriber pays a monthly amount to medical care providers who then oversee all the health care needs of the member. In an HMO or PPO, the member typically pays less for health care coverage than under a traditional indemnity insurance plan, but is limited in his or her choice of medical care providers. The district court, in its two opinions, described the trends and developments in the field of medical care which led to criticism of traditional indemnity insurance and to the development of alternative delivery systems and which provide the background to this case. See Reazin I, 635 F.Supp. at 1297-99; Reazin II, 663 F.Supp. at 1372-75
 
 
 [6]
 While New Century was determined on Blue Cross' motion for summary judgment to lack standing to seek damages, HCA's acquisition of New Century remained relevant to Blue Cross' Rule of Reason defense and to Blue Cross' counterclaim
 
 
 [7]
 The contracting provider agreement between Wesley and Blue Cross was part of a new agreement, the "Contracting Provider Agreement (Hospital) of the Competitive Allowance Program ('CAP')," which Blue Cross instituted in early 1984. The district court described CAP as follows:
 "The CAP program established the maximum amount [Blue Cross] would reimburse a medical provider for services within [a] particular diagnostic related group. Providers contracting with [Blue Cross] under the CAP program commit themselves to a maximum allowable payment ('MAP') for each service provided to the subscribers. The MAPs are based on uniform diagnostic-related groupings (DRGs) of medical services.... [T]he 'hold harmless' provision ensures subscribers will not receive bills for covered medical expenses in excess of the contract amount [Blue Cross] pays a participating provider."
 Reazin II, 663 F.Supp. at 1375 (citations to record omitted). The CAP contracting provider agreements also contained a "most favored nations" clause, pursuant to which participating providers agreed to promptly inform Blue Cross of, and make available to Blue Cross, any lower rates it charged to competing insurance companies. Thus, Blue Cross was assured of receiving the lowest rates its participating hospitals charged. Wesley had been a contracting provider with Blue Cross since the 1940s. In early July 1985, approximately two months before Blue Cross decided to terminate Wesley's contracting provider agreement, Blue Cross had renewed the agreement.
 There was considerable testimony about the significant advantages in being a contracting provider hospital and the considerable disadvantages to not having that status. See also Reazin I, 635 F.Supp. at 1295-96. From the perspective of Blue Cross subscribers, Wesley's loss of its contracting provider status would mean that those subscribers using Wesley (1) would not have the same assurance of predictability of health care costs which the maximum allowable payment concept guarantees; (2) would not get the benefit of the "hold harmless" clause limiting their liability; and (3) would not have access to direct payment of claims from Blue Cross to the hospital.
 The contracting provider agreement with Wesley was never, in fact, terminated because, pending resolution of this suit, the parties agreed to maintain Wesley's contracting provider status. The maximum allowable payments were, however, reduced for all hospitals, and Wesley agreed to accept those reduced payments. In 1986, before the trial in this case, HCA informed Blue Cross that it was withdrawing from the health care financing field and divesting HCP. Blue Cross thereafter signed a new contracting provider agreement with Wesley.
 
 
 [8]
 The letter included, in pertinent part:
 "We cannot stand idly by and watch insurance-hospital corporations, such as HCA, monopolize the delivery and financing of care by seeking to enroll Blue Cross and Blue Shield subscribers in their insurance programs. Vertical integration is a strategy some hospitals may feel to be in their best interest. However, if hospitals decide to compete with Blue Cross and Blue Shield in the manner that HCA is competing, Blue Cross and Blue Shield must make a business decision about its future relationship with these entities. Hospitals that wish to continue their current relationship with Blue Cross and Blue Shield, that do not seek to enroll subscribers in other programs, and that wish to cooperate with Blue Cross and Blue Shield as a major marketing arm of the hospital, will experience no change in the contractual relationship that has historically served Kansans well."
 Plaintiff's Ex. 468C, Addendum to Answer Brief of Appellees Vol. I (emphasis added).
 
 
 [9]
 In fact, the lease agreement also was never actually terminated
 
 
 [10]
 The district court instructed the jury that "the relevant product market in this case is private health care financing." R.Vol. III, Tab 207 at Instruction 37. In denying Blue Cross' McCarran-Ferguson Act exemption claim, the court stated that "[t]his case proceeded under all parties' agreement [that] 'private health care financing' includes 'self-insurance and self-insured administration' products." Reazin II, 663 F.Supp. at 1403. Additionally, the court noted that "[t]he market for private health care financing embraces defendant's activities with and through its subsidiary, [HMOK]." Id. As discussed more fully, infra, Blue Cross argues that the court should have instructed the jury to make findings as to the products constituting the market of private health care financing
 
 
 [11]
 Peer Group V includes the four Wichita hospitals and "is one of two geographically determined peer groups in the state." Reazin I, 635 F.Supp. at 1294
 
 
 [12]
 In Westman Comm'n Co., 796 F.2d at 1229, this court stated that "section one of the Sherman Act does not proscribe refusals to deal absent a showing of monopoly or market power on the part of the manufacturer." Thus, Blue Cross argues that, absent proof of at least market power, its refusal to deal with Wesley does not violate section 1. See also Schachar v. Am. Academy of Ophthalmology, Inc., 870 F.2d 397 (7th Cir.1989) ("the first question in any rule of reason case is market power."); Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc., 784 F.2d 1325, 1334 (7th Cir.1986) ("Market power is a necessary ingredient in every case under the Rule of Reason."). In certain circumstances, it may be that a detailed market analysis is not required. See note 24, infra
 
 
 [13]
 Blue Cross did not challenge Wesley's standing in either its motion for summary judgment or the pretrial order. See Motion of Blue Cross and Blue Shield of Kansas, Inc. for Summary Judgment, R.Vol. I, Tab 50 at p. 2; Pretrial Conference Order, R. Vol. II, Tab 76. The district court noted that Blue Cross failed to challenge Wesley's standing in its motion for directed verdict. Blue Cross finally challenged Wesley's standing in its Alternative Motion for Judgment Notwithstanding the Verdict or New Trial. Defendants' Alternative Motion for Judgment Notwithstanding the Verdict or New Trial, R.Vol. IV, Tab 246 at 2
 Plaintiffs do not appear to object to the district court's rulings that plaintiffs New Century and Reazin lacked standing to pursue damages but had standing to seek injunctive relief. See Reazin I, 635 F.Supp. at 1309-20.
 
 
 [14]
 While the district court did not specifically address antitrust injury, implicit in its discussion was its rejection of the combined argument Blue Cross made in its motion for judgment n.o.v. that Wesley failed to prove antitrust injury and lacked standing
 
 
 [15]
 Taken together, those cases reveal the following factors to be considered in determining antitrust standing: the causal connection between the antitrust violations and plaintiff's injury; the defendant's intent; the nature of the plaintiff's injury; the directness or indirectness of the connection between the plaintiff's injury and the allegedly unlawful market restraint; the speculativeness of the plaintiff's damages; and the "risk of duplicative recoveries ... or the danger of complex apportionment of damages." Associated Gen. Contractors, 459 U.S. at 544, 103 S.Ct. at 912
 The nature of the plaintiff's injury factor is designed to implement the requirement that only antitrust injuries are redressable under section 4. An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp., 429 U.S. at 489, 97 S.Ct. at 697. An injury which is merely causally linked in some way to an alleged antitrust violation is insufficient. Cargill, Inc., 479 U.S. at 109, 107 S.Ct. at 490; Brunswick Corp., 429 U.S. at 489, 97 S.Ct. at 697.
 
 
 [16]
 We are also aware that the Supreme Court may be concerned about reading section 4 of the Clayton Act too broadly. See Associated Gen. Contractors, 459 U.S. at 529-30 & n. 19, 103 S.Ct. at 904 & n. 19. We do not believe we have done so in this case
 
 
 [17]
 Choice Care was a PPO which Blue Cross attempted to introduce into Wichita in 1985, after ceasing to market HMOK. Blue Cross solicited competitive bids from all Wichita hospitals for participation in the Choice Care program. Wesley and St. Francis were initially selected as the successful bidders. After Blue Cross altered some of the provisions of the proposed Choice Care program, Wesley was unhappy with its submitted bid. During June and July of 1985, Wesley and Blue Cross officials met in an effort to resolve these problems. Wesley wanted to submit a new bid but was not permitted to. On July 31, 1985, Wesley received the proposed Choice Care contract from Blue Cross. Blue Cross decided in August to abandon the Choice Care program in Wichita
 
 
 [18]
 Indeed, there was abundant evidence that the only reason the Saints agreed to the reduced maximum allowable payments was because they anticipated a shift of patients from Wesley to the Saints as a result of the termination of Wesley's contracting provider agreement
 
 
 [19]
 We likewise affirm the district court's rejection of Blue Cross' argument that there could be no agreement because the only Blue Cross agents with the authority to terminate the Wesley contract, the executive committee, had no knowledge of the alleged conspiracy in which Blue Cross' senior management staff may have participated
 
 
 [20]
 One hospital administrator, however, testified that, after the threatened termination, his hospital proceeded with a proposed contract with HCP only because the contract contained a termination clause permitting the hospital to terminate the contract on six months' notice
 
 
 [21]
 Lynne Jeane, the executive director of Humana Hospital in Dodge City, Kansas, testified that Blue Cross' letter to all Kansas hospitals "confirmed what we understood was a threat. The announcement of the cancellation of Wesley's policy confirmed that they would carry out the threat.... [W]e have taken a position that we will wait and see what the outcome of this situation is before we attempt to provide any product." R.Vol. 28 at 2547. Ingo Angermeier, the associate administrator of Asbury Hospital in Salina, Kansas, testified that he told Blue Cross' Marlon Dauner that he "was concerned that [his] right as a provider to compete was being threatened." R.Vol. 20 at 1248. He further testified that his hospital had "substantially slowed down [its] discussion about a PPO," as a result of the threatened Wesley termination and the letter to all Kansas hospitals from Blue Cross President Wayne Johnston letter. Id. at 1292. Dale Martin, the Administrator and Chief Executive Officer of Graham County Hospital in Hill City, Kansas, testified that his hospital "ha[s] not had any more discussions with anybody concerning HMOs or PPOs since [he] received [the Johnston] letter." R.Vol. 28 at 2645
 
 
 [22]
 In response to Blue Cross' argument that its actions only benefited consumers, we note that there was evidence that Wesley had historically been not only the largest, but also the premier and one of the most cost-effective hospitals in Wichita. In view of Blue Cross' mandate to pursue cost containment, we view with some suspicion the argument that the termination of the largest and one of the most cost-effective hospitals promotes cost containment and thereby benefits consumers, either in the short run or over the long run
 
 
 [23]
 In Shoppin' Bag, 783 F.2d at 162, we approved the following instructions on determining market strength:
 "Market strength is often indicated by market share. Market share alone, however, is not enough to determine a firm's capacity to achieve monopoly.
 Other factors you should consider include the number and strength of the defendant's competitors, the difficulty or ease of entry into the market by new competitors, consumer sensitivity to change in prices, innovations or developments in the market, whether the defendant is a multimarket firm, as well as other evidence presented to you that you may deem persuasive regarding defendant's market strength."
 
 
 [24]
 The district court "agree[d] with plaintiffs' suggestion the finding of market power may well be unnecessary given the jury's findings of actual anticompetitive restraint of trade." Reazin II, 663 F.Supp. at 1416. The district court relied on FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), in reaching that conclusion. The Supreme Court in Indiana Fed'n of Dentists suggested two situations where an elaborate analysis of market power may be unnecessary. First, " 'the absence of proof of market power does not justify a naked restriction on price or output.' " Id. at 460, 106 S.Ct. at 2019 (quoting NCAA v. Bd. of Regents, 468 U.S. 85, 109-10, 104 S.Ct. 2948, 2964-65, 82 L.Ed.2d 70 (1984)). Such a restriction " 'requires some competitive justification.' " Indiana Fed'n of Dentists, 476 U.S. at 460, 106 S.Ct. at 2019 (quoting NCAA v. Bd. of Regents, 468 U.S. at 110, 104 S.Ct. at 2965). Second, even where a restraint is not sufficiently "naked," " 'proof of actual detrimental effects, such as a reduction of output' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.' " Indiana Fed'n of Dentists, 476 U.S. at 460-61, 106 S.Ct. at 2019 (quoting Areeda & Turner, Antitrust Law, p 1511 (1986))
 Indiana Fed'n of Dentists involved a horizontal agreement among Federation members to withhold dental X-rays from patients' insurance companies. Such an agreement could either be viewed as a "naked restraint" on output, or as resulting in such actual detrimental effects that, absent any procompetitive justification, it could be condemned without proof of market power. The Court agreed that ample evidence supported the finding that actual detrimental effects had been proven, because "in two localities ... Federation dentists constituted heavy majorities of the practicing dentists and ... as a result of the efforts of the Federation, insurers in those areas were, over a period of years, actually unable to obtain compliance with their requests for submission of x rays." Indiana Fed'n of Dentists, 476 U.S. at 460, 106 S.Ct. at 2019 (emphasis added). We need not decide whether the restraint in this case is of such a nature or resulted in such effects as to obviate the need for detailed proof of market power, because plaintiffs did present detailed evidence as to Blue Cross' market power. We further express no opinion on the situations where such proof may be foregone.
 
 
 [25]
 In Shoppin' Bag, 783 F.2d at 164, this court noted:
 "[W]e believe that both elements have been necessary since the test's initial inception. While the concepts of price and competition are closely connected, it is conceivable that if a company has obtained control over prices that it still may not have the power to exclude other competitors from the market.... The differences between the elements will vary according to the factual scenarios which arise. Thus, easy distinctions between the concepts will not always be possible. It seems that in most instances a true evaluation of market power will not ultimately be possible without substantial data presented on both elements."
 
 
 [26]
 In addition to receiving some 62% of all earned health insurance premiums in its service area, compared to less than 5% for other insurance companies, Blue Cross was the largest non-federal source of revenue for hospitals. For example, there was testimony that Blue Cross accounted for 16% of St. Francis' revenues, compared to less than 5% from Blue Cross' next largest competitor. Wesley's chairman and chief executive officer, Jack Davis, testified that Blue Cross accounted for approximately 18% of Wesley's revenues. R.Vol. 14 at 71. The same held true for hospitals outside Wichita. The associate administrator of Asbury Hospital testified that approximately 19% of Asbury's revenues came from Blue Cross, while the next largest insurance company accounted for at most 5%. R.Vol. 20 at 1231
 
 
 [27]
 "Self-insurance" refers to the situation where an employer, typically a large employer, itself performs the function of insurer for its employees. The employer often hires a third party, such as Blue Cross, to administer the program. In the testimony from various witnesses concerning Blue Cross' market share, substantial time was devoted to whether self-insurance and self-insureds should be included within the market of private health care financing, the market within which Blue Cross' market share was relevant
 Blue Cross' argument to this court is that the jury, as a result of the district court's failure to instruct on the make-up of the market, must have ignored self-insurance, because inclusion of self-insurance in the relevant market necessarily lowers Blue Cross' market share below that which could sustain a finding of market or monopoly power. We disagree. There was conflicting testimony on the proportion of all insureds who participate in a self-insurance program in Kansas. Plaintiffs' expert, Raymond Davis, testified that he was unable to obtain hard data on that question either from Blue Cross or from the Kansas Insurance Commissioner. There was testimony that on a national basis 39% of those insured were self-insured, but there was also testimony as to why that figure might not be an accurate reflection of the self-insurance situation in Kansas.
 Thus, the jury heard substantial, and conflicting, evidence both as to the percentage of the total insurance market that self-insurance represented as well as the propriety of including self-insurance when measuring Blue Cross' market share. We cannot say that the jury could not have found market or monopoly power from the evidence presented.
 
 
 [28]
 The district court described that as "legislation giving it [Blue Cross] the state's imprimatur." Reazin II, 663 F.Supp. at 1417. There was also testimony that being a contracting provider with Blue Cross was viewed as the "Good Housekeeping" seal of approval
 
 
 [29]
 Dr. Hay testified:
 "[T]hese new forms of competition [alternative delivery systems], that's where the downward pressure on price is going to come from. That's what is going to cause health care costs to Kansas consumers to be lower, all right. If Blue Cross can stop that, can suppress it or can slow it down, that means that the cost of health care financing in Kansas is going to be higher than it otherwise would and that means that because Blue Cross has the power to do that, the power to stop it or slow it down, in a very real sense Blue Cross has the power over price, the power to prevent those price pressures, all right, from coming about to the advantage of Kansas consumers."
 R.Vol. 35 at 3538-39. Blue Cross argues that Dr. Hay erroneously equated power over competition with power over price, in contravention of Shoppin' Bag, 783 F.2d at 164. However, in Shoppin' Bag, we specifically noted that the "concepts of price and competition are closely connected" and that "easy distinctions between the concepts will not always be possible." Id. Further, in United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 392, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956), the case relied on in Shoppin' Bag in its discussion of monopoly power, the Court specifically stated:
 "Price and competition are so intimately entwined that any discussion of theory must treat them as one. It is inconceivable that price could be controlled without power over competition or vice versa."
 Thus, we perceive no error in Dr. Hay's linkage of power over competition to power over price. Moreover, as we discuss further, plaintiffs introduced evidence of both Blue Cross' power over price and its power to exclude competition.
 
 
 [30]
 The fact that the First Circuit has recently concluded that, as a matter of law, a "Prudent Buyer" policy utilized by Blue Cross and Blue Shield of Rhode Island, essentially identical to the most favored nations clause in this case, did not constitute monopolization in violation of section 2 does not alter our conclusion on the existence of Blue Cross' monopoly power here. See Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield, 883 F.2d 1101 (1st Cir.1989). In Ocean State, Blue Cross conceded its monopoly power. Id. at 1110. The only question was whether Blue Cross violated section 2. By contrast, the most favored nations clause here is not itself challenged as unlawful monopolization. Rather, it is only considered as evidence of, or as contributing to, Blue Cross' market or monopoly power. We need not reach the question addressed in Ocean State of whether use of the most favored nations clause could itself violate section 2
 
 
 [31]
 The district court rejected this argument. The court opined that Blue Cross had waived that argument because, while asserted in Blue Cross' answer as a defense, it was abandoned in Blue Cross' motion for summary judgment and in the pre-trial order. Even if not waived, the district court concluded the argument was meritless under the immunity test of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943)
 Blue Cross does not make any broad immunity argument on appeal. It does, in passing, reassert the argument that, because Blue Cross' rates were subject to approval and regulation by the Kansas Commissioner of Insurance, Blue Cross could not control prices and therefore lacked monopoly, and possibly market, power. The district court rejected that specific argument, stating:
 "[T]he factual predicate for such an argument is simply absent in this case. Defendant's own economic expert, Peter Hamilton, was specifically asked at his deposition two weeks prior to trial: 'What role, if any, does the fact that Blue Cross is regulated by the Insurance Commissioner of Kansas play in your opinions?' His unequivocal answer: 'None at this time.' (Hamilton Depo., p. 57). At trial, [Blue Cross] called Dr. Hamilton to present its best defense to market and monopoly power, Dr. Hamilton's testimony was utterly bereft of any reference whatsoever to state rate regulation."
 Reazin II, 663 F.Supp. at 1419.
 We agree with the district court that Blue Cross effectively abandoned this argument. Furthermore, Blue Cross does not direct us to any materials indicating the nature of the regulation at issue and has thus failed to prove that the Insurance Commissioner engages in the kind of regulation which might indicate that Blue Cross lacks any control over price. Finally, not only did Blue Cross' expert, Dr. Hamilton, fail to mention state regulation in his discussion of Blue Cross' monopoly and market power, but a number of Blue Cross employees, as well, testified about Blue Cross' pricing policies without mention of state regulation.
 
 
 [32]
 We thus agree with the district court that Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., 784 F.2d 1325 (7th Cir.1986), a case on which Blue Cross heavily relies, is distinguishable. In Ball Memorial, Blue Cross' market share was smaller (27% of all patients in Indiana) and the health insurance market was evidently more competitive, with some 1000 firms licensed to do business in Indiana, and more than 500 selling insurance at the time of the decision. To the extent that the Ball Memorial court opined that entry barriers in the health care financing market are always low, in any health care financing market in the country, we respectfully disagree. See also Reazin II, 663 F.Supp. at 1420 n. 16; Reazin I, 635 F.Supp. at 1328-31
 
 
 [33]
 Blue Cross does not appear to challenge on appeal the award of punitive damages under the state law tortious interference claim. Accordingly, we do not address it
 
 
 [34]
 As the district court noted in Reazin I:
 "The case is presently before the Court in a unique posture because of the parties' voluntary agreement to preserve the status quo, continuing to abide by the terms of the Wesley/[Blue Cross] contracting provider agreement pending the outcome of this suit. The Court perceives the case as primarily a declaratory judgment action which will be tried to the jury to determine whether what is now the proposed termination of Wesley's contract, along with the formation and effect of the revised [Blue Cross] contracting provider agreements with the remaining Wichita hospitals, would violate the antitrust laws if carried out."
 Reazin I, 635 F.Supp. at 1316.
 
 
 [35]
 Plaintiffs initially argued Blue Cross' actions also interfered with Wesley's present and future business relations with patients, doctors, nurses, other medical personnel, administrators and staff, as well as with HCP's and New Century's present and future business relations with hospitals and other providers of health care services. The jury was only presented with a special interrogatory relating to Wesley's relationship with Blue Cross subscribers
 
 
 [36]
 The jury found that one of the elements of plaintiff HCP's tortious interference claim was not established. That element was the requirement that Blue Cross have undertaken its allegedly unlawful conduct "with the wrongful intent of injuring or destroying the business of" HCP
 
 
 [37]
 The Kansas Supreme Court referred to the Restatement (Second) of Torts Sec. 767 (1979), which discusses whether conduct is proper or improper:
 " 'In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relations of another is improper or not, consideration is given to the following factors:
 (a) the nature of the actor's conduct,
 (b) the actor's motive,
 (c) the interests of the other with which the actor's conduct interferes,
 (d) the interests sought to be advanced by the actor,
 (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
 (f) the proximity or remoteness of the actor's conduct to the interference, and
 (g) the relations between the parties.' "
 Turner, 722 P.2d at 1116-17.
 
 
 [38]
 "An Allen charge derives its name from jury instructions approved by the Supreme Court in Allen v. United States, 164 U.S. 492, 501-02, 17 S.Ct. 154, 157-58, 41 L.Ed. 528 (1896)." United States v. Porter, 881 F.2d 878, 888 n. 9 (10th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989)
 
 
 [39]
 Some three-and-one-half months after the verdict was returned, a juror submitted a letter to the court in which the juror claimed her verdict was coerced. See Reazin II, 663 F.Supp. at 1443 n. 20. The court denied Blue Cross' motion for a hearing into the letter. Blue Cross argues that denial was error. We disagree. We regard this as a classic example of a juror attempting to impeach her own verdict, which we will not permit in this case. See Tanner v. United States, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987); United States v. Miller, 806 F.2d 223, 225 n. 2 (10th Cir.1986); Holden v. Porter, 405 F.2d 878, 879 (10th Cir.1969)
 
 
 [40]
 Blue Cross made several motions for a mistrial during the jury's deliberations. In its third such motion, made four days before the jury returned its verdict, Blue Cross did not even raise the court's communications with the jury as a ground for the motion. See R.Vol. 44 at 85-86
 
 
 [41]
 HMOK was an HMO which Blue Cross attempted to introduce into Wichita in 1984. Ultimately, in 1985, Blue Cross withdrew HMOK from Wichita. The counterclaim largely revolves around the reasons for HMOK's lack of success in the Wichita market. The district court thoroughly explored the evidence relating to HMOK's failure in its two opinions. See Reazin I, 635 F.Supp. at 1300-01; Reazin II, 663 F.Supp. at 1376-77, 1465-68
 
 
 [42]
 Section 7 of the Clayton Act, 15 U.S.C. Sec. 18, prohibits acquisitions the effect of which "may be substantially to lessen competition, or to tend to create a monopoly."
 
 
 [43]
 While Blue Cross listed it as an issue in its docketing statement, it does not brief the district court's grant of summary judgment on the interference with prospective advantage claim. We consider it abandoned
 
 
 [44]
 Blue Cross also argues the acquisitions violate sections 1 and 2, although the counterclaim itself was not completely clear on that point. Additionally, in the pretrial order, Blue Cross agreed that a remaining legal issue was "[w]hether HCA acquired Wesley, Health Care Plus, and New Century in violation of section 7 of the Clayton Act." No mention was made of sections 1 and 2
 
 
 [45]
 28 U.S.C. Sec. 1920 provides that a federal court may tax as costs against the losing party certain items, including "fees and disbursements for ... witnesses." 28 U.S.C. Sec. 1920(3). 28 U.S.C. Sec. 1821 defines the witness fees specified in section 1920(3). In addition to an attendance fee of $30.00 per day, section 1821 also permits a witness to recover for travel expenses to and from trial and provides a subsistence allowance if the witness must stay overnight to attend trial
 
 
 [46]
 In Crawford Fitting, the Supreme Court held that "absent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's witnesses as costs, federal courts are bound by the limitations set out in 28 U.S.C. Sec. 1821 and Sec. 1920." Id. at 445, 107 S.Ct. at 2501. Specifically, the Court held that Fed.R.Civ.P. 54(d) did not permit an award of expert witness fees in excess of the limits contained in 28 U.S.C. Sec. 1821. Blue Cross argues that same rule applies to 15 U.S.C. Sec. 15(a) permitting a prevailing antitrust plaintiff to recover "the cost of suit." Thus, section 15(a) cannot permit costs beyond those expressly permitted in 28 U.S.C. Sec. 1821
 Plaintiffs respond that Crawford Fitting is limited to cases where a court invokes Rule 54(d). It says nothing about awards of costs under 15 U.S.C. Sec. 15.
 
 
 [47]
 In several diversity cases, however, we have stated that "[a]bsent express statutory or contractual authorization for the taxation as costs the fees of a party's expert witness, federal courts are bound by the limitations set out in 28 U.S.C. Secs. 1821 and 1920." Miller v. Cudahy Co., 858 F.2d 1449, 1461 (10th Cir.1988) (citing Crawford Fitting ), cert. denied, --- U.S. ----, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989); see also Chaparral Resources, Inc. v. Monsanto Co., 849 F.2d 1286 (10th Cir.1988); Cleverock Energy Corp. v. Trepel, 609 F.2d 1358, 1363 (10th Cir.1979), cert. denied, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980)
 
 
 [48]
 In reaching this conclusion, we are aware that the question of whether expert witness fees should be viewed as "costs" or as expenses of litigation recoverable as attorneys' fees has engendered some disagreement among courts. And, particularly in view of Crawford Fitting, we are aware of the hotly contested issue of whether expert witness fees are recoverable as part of the attorneys' fees a prevailing party may recover under 42 U.S.C. Sec. 1988. Compare Friedrich v. City of Chicago, 888 F.2d 511 (7th Cir.1989) with West Virginia Univ. Hosps., Inc. v. Casey, 885 F.2d 11 (3d Cir.1989), cert. granted, --- U.S. ----, 110 S.Ct. 1294, 108 L.Ed.2d 472 (1990). Although this circuit has held that such expert witness fees can be included in an award of attorneys' fees under 42 U.S.C. Sec. 1988, we decline in this case to extend that reasoning to section 4 of the Clayton Act
 
 
 [49]
 In Ramos, we further stated that "[a]bsent more unusual circumstances than we see in this case, the fee rates of the local area should be applied even when the lawyers seeking fees are from another area." 713 F.2d at 555. We thus contemplated the possibility that "unusual circumstances" might warrant a departure from local hourly rates. The district court in this case found such "unusual circumstances."